## DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT, CITY OF BALTIMORE ET AL. *v.* ELLWEST STEREO THEATERS, INC. OF MARYLAND

[No. 105, September Term, 1971.]

*Decided December 13, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Richard M. Hartman, Special Assistant City Solicitor,* and *Joseph S. Matricciani, Assistant City Solicitor,* with whom was *George L. Russell, Jr., City Solicitor,* on the brief, for appellants.

*Franklin Goldstein,* with whom were *Burke, Gerber & Wilen* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

This appeal is brought by the Department of Housing and Community Development and the Mayor and City Council of Baltimore (hereinafter jointly referred to as the City), appellants, from an order of the Circuit Court of Baltimore City (Perrott, J.) enjoining the City from denying the validity of certain permits issued to Ellwest Stero Theaters, Inc. of Maryland (Ellwest) appellee, including a permit to operate an arcade. The City contends that Ellwest is actually operating a theater, which requires a City ordinance for the construction of or conversion of a building into a theater and in the absence of

such authorization is operating illegally. In the memorandum opinion accompanying his order the chancellor noted that while Ellwest "is probably operating a motion picture theater as contemplated by Chapter 14, Article 32 of the Baltimore City Code, the City shall nonetheless be estopped from denying the legality of the building permits issued in the instant case." We affirm the order of the chancellor but not on the basis of estoppel working against the City, but, because we are of the opinion that Ellwest is not operating a theater within the meaning of that term as contemplated in the City Code. Therefore, we address ourselves to the pivotal issue, is the premise in which the appellee conducts its business a "theater"?

The subject premises designated as No. 7 N. Guilford Avenue in the City of Baltimore, as improved by Ellwest, is a ground floor location containing twenty-two individual booths. Each booth is equipped with its own individual coin-operated movie projector and screen. There is a printed regulation on the wall of each booth stating that only one person may be in a booth at one time. From the exhibits filed in the record it would appear that a booth would accommodate only one normal size person at a time. Only one individual watches a movie on one screen which can be observed only by that individual. Individuals in the various booths may select different films in the different booths. There is no projector operator. The projector is activated by the patron when he places a coin in the slot in his booth.

In *Sanza v. Maryland Board of Censors*, 245 Md. 319, 226 A. 2d 317 (1967), this Court was confronted with a similar, if not identical, "peep show" operation as in the case at bar, catering to those whose tastes run to the pornographic. There the issues were whether the films were obscene and the constitutionality of certain provisions of Maryland Code (1970 Repl. Vol.), Article 66A, dealing with the censorship of movies. Judge Oppenheimer, writing the opinion for the Court, commented in graphic language:

"The films are not shown in a theater, but are viewed only by a single spectator in a booth. Margaret Meade, the anthropologist, points out the distinction between 'the pornographic, condemned in every society, and the bawdy, the ribald, the shared vulgarities and jokes, which are the safety valves of most social systems.' She contrasts the music hall with 'the pornography primarily designed to be brooded over in secret.' Mead, *Sex and Censorship in Contemporary Society,* New World Writing 7, 23-24 (New American Library 1953). In the case before us, the films are part of an apparatus often referred to as a peep show, in which the solitary observer pays, minute by minute, for the gratification of his voyeurism." 245 Md. at 331.

True, the above quoted language from Sanza is purely dicta, nonetheless, we think Judge Oppenheimer's reaction that the place containing the 21 individual booths in which the films were shown was not a theater goes to the core of the matter in the instant case. Such a place is not a theater within the common parlance and experience of society.

In *IV Webster's New International Dictionary, Unabridged,* page 2617 (2nd Edition, 1957), "theater" is defined in part as follows:

"1. An edifice for *dramatic performances* of spectacles . . . Modern theaters have two main parts: (1) The auditorium, balconies, tiers of boxes flanking the proscenium arch, with the entrance, corridors, lobbies, foyer, etc.; (2) The stage with its side wings and flies, and with dressing rooms, etc., for the actors.

"2. That which resembles a theater (sense 1) in form, use, or the like; as: (a) A place rising by steps or graduations. (b) Any room adapted to *any exhibition or performance before*

*an assembly,* as a lecture, scholastic exercise, surgical clinic, etc. (c) An amphitheater . . ." (Emphasis supplied).

In *Black's Law Dictionary,* page 1647 (4th Edition, 1968), "theater" is defined as follows:

"Any edifice used for the purpose of *dramatic* or operatic or other representations, plays, or *performances, for admission to which entrance-money is received,* not including halls rented or used occasionally for concerts or theatrical representations." (Emphasis supplied).

4 Am. Jur. *Amusements and Exhibitions,* § 2, p. 122, defines a theater as, "* * * Standard authorities define it as a building specially adapted to dramatic, operatic, or spectacular representations; a playhouse * * *. This is also its primary significance in modern times. * * *."

The type of business conducted by Ellwest would not be a theater under any of the above definitions. There is no general admission or any admission money paid upon entering the premises, the only payment being that made by placing a coin in the slot in the private booth to activate the projector in that individual booth. Furthermore, the premises contains no assembly space of any consequence.

In its efforts to apply the definition of theater to Ellwest's premises the City relies solely on the language of Article 32, Chapter 20, Section 201, subparagraph 165 of the Baltimore City Code (1966 ed.), which defines "theater" as follows:

"Theater shall mean a building or any part thereof, generally used or designed to be used for the giving of operatic or dramatic performances or cinema productions or both."

The City jealously guards the right of the Mayor and City Council to approve by ordinance the "construction, erection, or conversion of, or addition to any building or

other structure to be used for a motion picture theater."
We cannot help but believe that this prerogative, not ap-
plicable to normal structures, is rooted in the bitter ex-
perience of the past history of Baltimore with regard to
catastrophic fires. In *Brown v. Stubbs*, 128 Md. 129, 134,
97 A. 227 (1916), this Court quoting from the earlier
case of *State v. Loden*, 117 Md. 373, 380, 83 A. 564
(1912), stated:

> "In large cities, compactly built, like Balti-
> more, there exist possibilities of immense loss
> of property by fire as was shown by the great
> fire of 1904, which swept the business section
> of the city and destroyed property worth many
> millions of dollars. Moreover, in large cities
> moving picture machines are usually operated
> in large, crowded rooms or halls filled with a
> constantly changing assemblage, largely com-
> posed of women and children, and where in the
> event of explosion or fire, excitement and panic
> usually follow, resulting in great loss of life.
> Therefore, every reasonable and proper precau-
> tion and safeguard should be taken to prevent
> or lessen the possibilities of fires so destructive
> and disastrous in their consequences." 128 Md.
> at 134.

The dissimilarity between theater premises described
in the above opinion and that of the business premises of
Ellwest becomes obvious by simple comparison. The
premises where Ellwest conducts its business is not a
large crowded room with seats arranged row upon row,
generally filled with a constantly changing assembly, all
watching one screen, it is not a place where emotions
shared simultaneously by the entire assemblage may re-
sult in tumult or from which there is the danger of a
mass and frantic exodus by those assembled.

The supervisor in the construction division of the De-
partment of Housing and Community Development was
well briefed on the use to be made of the premises when

684

the first permit for alterations was issued on September 11, 1969. This supervisor discussed the matter with his superiors and was specifically advised that the proposed operation was not a movie theater and did not require a city ordinance. This supervisor was of the opinion that it did require an arcade license which costs $1500 per year and which sum was paid to the City by Ellwest. After Ellwest had committed itself to a $70,800 rental obligation covering a period of 4 years, made approximately $11,000 in improvements to the leasehold and installed some $22,000 in equipment, the City had a change of mind. The City Solicitor's office (no doubt prompted by the commendable motive to rid the City of one more refuge for pornography), in October of 1970 advised the Commissioner of the Department of Housing and Community Development that Ellwest's business constituted a theater and that it should have obtained the necessary authorization to alter the premises through a city ordinance. Accordingly, shortly thereafter the City notified Ellwest to cease business.

Resting our decision on this case on the grounds that Ellwest is not operating a theater, we affirm the order of the lower court and find it unnecessary to reach the issue of estoppel upon which the chancellor had based his opinion.

*Order affirmed, appellants to pay costs.*