## GAYETY BOOKS, İNC. AND FAYETTE NEWS CENTER, INC. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 101, September Term, 1976.]

*Decided January 24, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*William E. Seekford* for appellants.

*Carl Berenholtz, Assistant City Solicitor,* with whom was *Benjamin L. Brown, City Solicitor,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Article 15, § 71 (a) of the Baltimore City Code (1966) (the ordinance) requires that

> "Every person, firm, association, or corporation owning, or operating, or placing, or keeping, or permitting to be kept, or maintaining for use, or permitting the use of, any of the hereinafter described amusement devices for public entertainment or amusement, in any place or on any premises in the City of Baltimore shall obtain an annual license from the City Treasurer and shall pay therefore the annual license fee hereinafter set forth, before any such amusement device is placed in use or operation for any of the purposes hereinbefore mentioned . . . ."

The amusement devices covered by the ordinance are described in subsection (a) (1):

> "the term 'coin-operated amusement device' includes, but is not limited to, the following devices, if the same are operated or activated by coins or tokens; claw machines, bowling machines, shuffle board machines; pinball machines, pool tables, console machines, target machines, baseball machines, and other similar devices; provided, however, that such term does not include bona fide vending machines in which amusement features are not incorporated or made a part thereof. . . ."

The subsection, as amended, sets an annual license fee of $150 for each such device with exceptions not here relevant. Fayette News Center, Inc. (Fayette) and Gayety Books, Inc. (Gayety) were alleged to have operated such devices in Baltimore City, Gayety in 1972 and Fayette in 1971 and 1972. The Mayor and City Council of Baltimore (Baltimore City) sought to collect the license fees required by ordinance. The primary issue for decision is whether the ordinance is constitutional on its face and as applied to Fayette and Gayety. We hold that it is constitutional on its face and as applied.

The devices operated by Fayette and Gayety were coin-operated movie machines in individual viewing booths. In *Dept. of Housing v. Ellwest Stereo*, 263 Md. 678, 284 A. 2d 406 (1971) we held that establishments having a number of such devices on the premises were not motion picture theatres so as to be subject to motion picture theatre regulations. It was after this decision that Baltimore City attempted to collect the annual license fee required by the ordinance. When Fayette and Gayety refused to pay the fees for the devices operated by them, Baltimore City sued them in the District Court.[1] The actions were instituted by the

---

1. Subsection (h) of the ordinance makes it a misdemeanor to violate any of the terms or provisions of the section and any of the rules or regulations pertaining thereto and authorizes a penalty upon conviction of a fine of not more than $100 for each offense.

Subsection (g) empowers the City Treasurer "to make, adopt, promulgate

filing of statements of claim for summary judgment, in one case in the amount of $1350 for 9 devices against Gayety and Martin McKew, but referred to hereinafter simply as Gayety, and in the other case in the amount of $2850 against Fayette and 205 West Fayette Street Corporation, referred to hereinafter simply as Fayette. Each claim contained the common counts in assumpsit, and a special count referring to the ordinance and alleging that the defendants had not obtained the licenses required although found by Baltimore City to have such amusement devices on their premises. In each case the defendants elected a jury trial. The actions were transferred to the Superior Court of Baltimore City. Fayette and Gayety pleaded the general issue, and each filed a motion to dismiss and a supplemental motion to dismiss. The grounds for each original motion were that the ordinance as written and as applied was repugnant to the first, fourth, fifth and sixth amendments to the Constitution of the United States as applicable to the states under the fourteenth amendment. The ground for the supplemental motions was Ordinance No. 811, adding a new § 149 to Art. 32 of the Baltimore City Code, which had been duly passed and approved on 26 February 1975, effective thirty days from its passage. It required licensing for each "peep show establishment",[2] § 1491, and a license for each coin-operated motion picture device, § 1496. Fayette and Gayety contended that the passage of this ordinance further rendered Art. 15, § 71 constitutionally repugnant because the new ordinance "cannot be superimposed upon the licensing requirements and fees of Article 15." They urged

and amend, from time to time, such rules and regulations as he may deem necessary or proper to carry out and enforce the provisions of [the ordinance] . . . ." If such rules and regulations have been made, they are not included in the joint record extract submitted.

2. Baltimore City Code (1966), Art. 32, § 1490 (a) defines "peep show establishment" as "a building or any part thereof containing one or more peep show devices." By § 1490 (b) a peep show device "shall mean any device operated for commercial purposes, wherein motion picture or slide films are projected or viewed upon a screen or through a viewer, or in which viewed images are exhibited by means of the projection of internal electronic reflection of motion picture film or slides, but nothing herein is intended to apply to 'theatres' as defined in Chapter 20 of this Article 32, nor to the viewing of television which reflects externally transmitted images."

that the passage of Ordinance No. 811 showed that the former ordinance did not contemplate the licensing and regulation of coin-operated motion picture devices.[3]

While all this was going on, an action challenging the constitutionality of Art. 15, § 71 of the Baltimore City Code was before the United States District Court for the District of Maryland. It had been brought by Al Star as President and Manager of Fayette and Gayety, seeking declaratory and injunctive relief against the Mayor, Director of Finance, City Solicitor and Treasurer of the City of Baltimore and the Governor and Attorney General of Maryland.[4] On 26 September 1973 the court held that "Art. 15, § 71 (a) (1) is constitutional on its face and as applied to the plaintiff", and ordered that judgment be entered in favor of the defendants. *Star v. Benton*, Civil No. 72-607Y, unreported. The judgment was affirmed by the United States Court of Appeals for the Fourth Circuit in a per curiam opinion filed 23 December 1975, which read in its entirety:

> "We affirm for the reasons stated by the district court. The City of Baltimore can apply a non-regulatory, non-confiscatory license tax on all coin-operated amusement devices to coin-operated movie machines." *Star v. Benton*, 530 F. 2d 970.

By agreement of counsel, the proceedings against Fayette and Gayety in the Superior Court of Baltimore had been delayed pending the outcome of the litigation in the federal courts. As the federal case had become final to the extent that appellate review was available as a matter of right, Jones, J., presiding in the Superior Court of Baltimore City, deeming the decision of the United States District Court to be dispositive "as of the present time", brought the cases

---

**3.** Fayette and Gayety also each filed a second supplementary motion to dismiss, grounded on failure to comply with Maryland Rule 520 and Superior Bench Rule 528L in bringing the cases to trial. The denial of these motions by the court below is not challenged on appeal.

**4.** In deciding the case, the court observed that "there were neither allegations nor evidence presented to connect [the Governor and Attorney General] with this case."

before her to a hearing, which was held on 18 March 1976.[5] On 24 March the court denied the motions to dismiss of each of Fayette and Gayety. It granted Baltimore City's motions for a summary judgment as to the issue of the liability of Fayette and Gayety for the payment of license fees, leaving to be litigated at trial only the factual issue of the number of coin-operated devices which were in operation.

At trial on 5 April 1976, with Fayette and Gayety expressly preserving the question of the applicability of the ordinance and "the liability of the fee itself," it was stipulated that during 1971 and 1972 Fayette had nine coin-operated movie machines in operation at 205 West Fayette Street for a total license fee charge in the amount of $2650, and that during 1972, Gayety had nine such devices in operation at 409 East Baltimore Street for a total license fee charge in the amount of $1350. Upon inquiry by the court, the parties agreed that, "as to the arithmetic" the fees were correctly computed.[6] Judgment absolute was entered in favor of Baltimore City in each case — in the amount of $2650 with interest and costs against Fayette, and in the amount of $1350 with interest and costs against Gayety. Each noted an appeal to the Court of Special Appeals. By order of that court, the appeals, separately docketed, were consolidated for briefing and argument. We granted certiorari before decision by the Court of Special Appeals.

In denying the motions to dismiss and granting the motions for summary judgment, Judge Jones found that the comprehensive opinion of Judge Joseph H. Young, accompanying the order of the federal district court in *Star v. Benton, supra,* "disposed of the same legal issues raised in the present proceedings, i.e., the constitutionality of the license fees and the enforcement thereof by the City." As we

---

5. Judge Jones noted that a petition for the issuance of a writ of certiorari in the federal case was pending before the Supreme Court of the United States. Certiorari was later denied, Star v. Benton, 426 U. S. 934 (1976).

6. The arithmetic was wrong with respect to Fayette. The fee for nine machines at $150 a machine was $1350 a year. For two years the total fee would be $2700, not $2650. A bill sent to Fayette by Baltimore City on 6 June 1972 charged for ten machines for 1971 in the amount of $1500 and for nine machines in 1972 in the amount of $1350, a total of $2850.

have indicated, she accepted Judge Young's decision that the ordinance was constitutional on its face and as applied with respect to Fayette and Gayety as "dispositive of the legal issues here presented."

Fayette and Gayety attack the constitutionality of the ordinance on the grounds that it is void for vagueness as written and applied, that it is lacking in adequate procedural safeguards, that it denies due process and equal protection, and that it is an impermissible tax upon first amendment rights and. thus a prior restraint upon expression. The substance of these grounds was considered and rejected in *Star v. Benton, supra.*[7] Fayette and Gayety argue the contentions they place before us, but they do not do so in terms of why, in their opinion, the district court's reasons in reaching conclusions contrary to their view were wrong. In fact, their only reference to the district court case is in claiming that Judge Jones erred in relying in her judgment on Judge Young's opinion for the law and legal issues with respect to the case she was trying because "Maryland courts are the final arbiters of state law. And only an authoritative decision of the United States Supreme Court is determinative of issues of federal law over our highest courts, . . . . A construction of state law, however, is left to state courts and will not be reversed unless it involves a federal question. . . ." (citations omitted). Of course, "[t]he Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof . . . are, and shall be the Supreme Law of the State." Art. 2. Declaration of Rights, Constitution of Maryland. And the decisions of the Supreme Court of the United States construing the federal constitution and acts of Congress pursuant thereto are conclusive. *Wilson v. Turpin,* 5 Gill 56 (1847); *Howell v.*

7. In Star v. Benton, Civil No. 72-607Y (D. Md. 1973) unreported, *affd.,* 530 F. 2d 970 (4th cir. 1975), *cert. denied,* 426 U. S. 934 (1976), the court stated that the constitutionality of the ordinance was attacked on the grounds "that the ordinance acts as a prior restraint on First Amendment rights, is overly broad and vague, lacks procedural safeguards, gives administrative officials unlimited discretion, is class legislation, and further, that the application of the ordinance has been unconstitutional due to discriminatory enforcement, suppression of First Amendment materials, unequal taxation and harassment by City officials."

*State*, 3 Gill 14 (1845). The courts of this State, however, are not bound by the holdings of a federal district court or of a federal circuit court of appeals. *Wiggins v. State*, 275 Md. 689, 698-716, 344 A. 2d 80 (1975); *Davis v. Director*, 29 Md. App. 705, 713, 351 A. 2d 905 (1976). But state courts may consider opinions of federal courts as persuasive authority. We have not heretofore reviewed the constitutionality of the ordinance in the context presented to us now, and in the absence of cases directly on the point in this State, the trial court here was persuaded by the district court opinion in *Star v. Benton, supra*, set out in Appendix A hereof. Having considered the cases and authorities therein cited and the cases and authorities cited by Fayette and Gayety, we are also persuaded by the district court opinion. We hold that there were no constitutional infirmities in the ordinance as claimed by Fayette and Gayety. The reasons for our holding are those reasons, as are applicable to the contentions here made, stated by the federal district court in arriving at its conclusions of law, leading to the finding that the ordinance was constitutional on its face and as applied to Fayette and Gayety.

Fayette and Gayety present as one of eight questions: "When one license for a motion picture projector under Article 32, § 149 is specifically required with procedural guidelines, may the City require a second license under Article 15, § 71 of the Baltimore City Code." They divide their argument, however, into five parts, and the only reference to Art. 32, § 149 appears under that part dealing with first amendment rights, and then only to the extent of a bald assertion: "It should be sufficient licensing for police power purposes to require only the specific ordinance of Article 32, § 149 to be enforced and which has been complied with by [Fayette and Gayety] paying $100.00 licensing fees for it." No issue with respect to Art. 32, § 149 is properly before us. By § 2 of Ordinance 811, its provisions became effective thirty days from the date of its passage on 26 February 1975, and, thus, in no way affected the licensing and fee required by Art. 15, § 71 for the years 1971 and 1972. We shall consider the validity of Art. 15, § 71 in the

light of Art. 32, § 149 when it is properly an issue to be decided.

Fayette and Gayety claim that the trial court erred in granting Baltimore City's motion for summary judgment. Maryland Rule 610 (a) 1 provides that a party may make a motion for a summary judgment in his favor as to all or any part of the claim on the ground that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. *See Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 327 A. 2d 502 (1974). Fayette and Gayety assert that there was a genuine dispute as to material facts.[8] As the trial court granted the motion, it is manifest that it found that there was no genuine dispute as to a material fact, and that Baltimore City was entitled to judgment as a matter of law in an amount commensurate with the number of devices in operation. That the number of devices in question was to be determined by the trier of fact upon evidence adduced did not preclude the grant of summary judgment as to liability for the license and fee. It appears that Fayette and Gayety confuse questions of fact and matters of law. They say that the grant of the motion precluded their "opposition to the constitutionality and applicability of the statute and the liability of the fee itself." They argue:

> "[T]he determination of the exact number of coin-operated devices and the determination that such devices were other similar amusement devices, as the city officials claim, that the determination as to the amount actually placed in use or in operation and whether they came within the ordinance is a jury question properly determinable only by them, as Defendants dispute the facts of Plaintiff's Motion for Summary Judgment. Judge Jones never saw the machines or their operation."

---

8. For reasons that are not apparent, this contention is not answered in Baltimore City's brief.

As we have indicated, the determination of the exact number of devices in operation was left for the trier of fact. But the "constitutionality and applicability" of the ordinance and "the liability for the fee itself" were not questions of fact but were matters of law for the court to determine. We think that the point Fayette and Gayety attempt to make is as stated later in their brief: "The determination of whether the coin-operated projectors were or were not other amusement devices was for the trier of fact. In this case it was for the jury to determine, or whether they were 'similar' (sic)." We do not share this view. It is patent that the devices here were coin-operated motion picture machines.[9] Whether such devices were within the contemplation of Art. 15, § 71 as subject to licensing is a matter of statutory construction for the court and not a question of fact for the trier of fact. The trial court was correct in finding that there was no genuine dispute as to a material fact with respect to the necessity of obtaining a license and that Baltimore City was entitled to judgment as a matter of law with respect to the liability of Fayette and Gayety for payment of license fees. The grant of the motion for summary judgment was not erroneous.

*Judgments affirmed; appellants to pay costs.*

---

9. In a Memorandum of Points and Authorities supporting the Motion to Dismiss, Gayety said: "These machines are operated by the insertion of a quarter into the coin slot in order to view the motion picture film. . . . A motion picture can only be shown or viewed with the aid of some sort of mechanical device usually a projector and screen or a single individual viewing machine." There are other references to "these coin operated viewing machines." See also the Supplementary Motion to Dismiss filed by Fayette, et al., in which the devices are referred to as "coin-operated motion picture projectors."

## APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CIVIL NO. 72-607-Y

AL STAR, as Manager and President of FAYETTE NEWS CENTER, INC., and GAYETY BOOKS, INC.

V.

CHARLES L. BENTON, in his capacity as Director of Finance of the City of Baltimore, the Honorable WILLIAM DONALD SCHAEFER, in his capacity as Mayor of the City of Baltimore, the Honorable GEORGE L. RUSSELL, JR., in his capacity as City Solicitor for the City of Baltimore, JOHN A. LUETKEMEYER, JR., in his capacity as Treasurer of the City of Baltimore, the Honorable MARVIN MANDEL, Governor of the State of Maryland, and the Honorable FRANCIS B. BURCH, Attorney General for the State of Maryland

### MEMORANDUM AND ORDER

Plaintiff, Al Star, challenges the constitutionality of Article 15 of the Baltimore City Code, further alleging a conspiracy by defendants to interfere with the exercise of his First Amendment rights in violation of 42 U.S.C. §§ 1983 and 1985 and the First Amendment. Seeking declaratory and injunctive relief against the enforcement of Baltimore City Code, art. 15, § 71 (1966) [1] as well as money

---

1. The text of Baltimore City Code, Art. 15, § 71 (1966):

71. Licenses.

(a) *Required; fees.* Every person, firm, association or corporation owning, or operating, or placing, or keeping, or permitting to be kept, or maintaining for use, or permitting the use of, any of the hereinafter described amusement devices for public entertainment or amusement, in any place or on any premises in the City of Baltimore shall obtain an annual license from the City Treasurer and shall pay therefor the annual license fee hereinafter set forth, before any such amusement device is placed in use or operation for any of the purposes hereinbefore mentioned:

(1) One Hundred Fifty dollars ($150.00) for each and every coin-operated amusement device, except such devices covered by subparagraph (2) hereof. For the purposes of this subparagraph (1), the

damages, plaintiff invokes jurisdiction under 28 U.S.C. §§ 1331, 1343 (3)-(4) and 2201. Having considered the evidence presented and arguments made on behalf of the parties, this court enters the following:

## FINDINGS OF FACT

Plaintiff is president and manager of Fayette News Center, Inc., and Gayety Books, Inc., adult book stores with a number of individual viewing booths on the premises that are equipped with coin-operated movie machines; there are fourteen at Gayety and nine at Fayette.

Defendants, Charles L. Benton, Director of Finance; George L. Russell, Jr., City Solicitor; John A. Luetkemeyer, Treasurer; William Donald Schaefer, Mayor, are all officials of the City of Baltimore. Defendants Marvin Mandel and Francis B. Burch are Governor and Attorney General, respectively, for the State of Maryland. As to the last two defendants, there were neither allegations nor evidence presented to connect them with this case.

Through a series of letters from officials of the Department of Finance (the first letter dated March 9, 1972), plaintiff was notified that each of his machines required payment of an annual license fee of $150.00 under § 71 (a) (1) of Article 15, which licenses "coin-operated amusement devices." It was stated in the letters that failure to pay the required fees promptly would leave the plaintiff open to criminal prosecution, making him subject to arrest for a misdemeanor and liable for a fine of one hundred dollars for each offense.

The decision to tax these machines under Section 71 followed the decision in *Dept. of Housing and Community Development v. Ellwest Stereo Theaters, Inc.*, 263 Md. 678,

---

term "coin-operated amusement device" includes, but is not limited to, the following devices, if the same are operated or activated by coins or tokens: claw machines, bowling machines, shuffle board machines, pinball machines, pool tables, console machines, target machines, baseball machines, and other similar devices; provided, however, that such term does not include bona fide vending machines in which amusement features are not incorporated or made in part thereof; * * *

284 A. 2d 406 (Dec. 13, 1971). The Court of Appeals of Maryland held that establishments having a number of these coin-operated movie machines on the premises were not motion picture theaters as the City of Baltimore contended and not subject to motion picture theater regulations. Following the *Ellwest* decision, Benton was advised that he should proceed with the collection of license fees for these coin-operated machines. (PX-1, p. 11)

Plaintiff cites this sequence of events as evidence of selective enforcement and harassment to effect suppression of his activities by attempting to force him out of business. Defendants explain this chain of events as an effort to fit plaintiff's businesses under the appropriate ordinance in recognition of *Ellwest*. The testimony of Benton (PX-1, p. 17) substantiates the City's position that the ordinance is enforced uniformly and all those with coin-operated amusement devices in the City must pay the fee. Plaintiff offered no evidence to controvert this except to state that motion picture projectors are not taxed under section 71. From this evidence it is apparent that the application of this ordinance is uniform.

On the question of the prohibitive nature of this tax, the record is silent as to the income from the machines and lacks any data to show that a tax of $150.00 is truly prohibitive; further, he did not allege or show that he is unable to pay the fees. When questioned about other taxation of his businesses, plaintiff answered that he pays for a "trader's license" which was described as a general business license. Mr. Kinnersley stated in his deposition that this trader's license was the only other (other than § 71) tax that he knew of that plaintiff was required to pay, and that this license was issued "by the Court of Common Pleas under the state." (PX-2, p. 20) The evidence is clear that the fees imposed under section 71 are the only City tax imposed on the plaintiff's businesses.

Attempts by the City to revoke permits granted under section 71 to similar businesses have occurred (PX-1, p. o). These attempts led to the *Ellwest* case where plaintiffs succeeded in enjoining the withdrawal of their arcade

permits granted under Article 15, § 71 (b). The power to revoke or refuse to license machines under this ordinance is understood by Benton (PX-1, p. 7) to reside in the Director of Finance upon the approval of the Mayor under Article 15, § 22.[2] This authority is urged by plaintiff to be arbitrary and overbroad, making the ordinance unconstitutional. However, such an interpretation of section 22 and its relationship to section 71 is not advanced in any judicial decision or administrative opinion relied on by the City.

Establishments having fifteen or more coin-operated devices, licensed under Article 15, § 71 (a) (1), qualify for licensure as an amusement arcade under Article 15, § 71 (b), and must pay an annual fee of $1200.00.[3]

No evidence was presented of any rules or regulations promulgated under section 71 (g) for enforcement and collection of fees.[4]

There was no showing of "bad faith" enforcement of these ordinances or a conspiracy to suppress plaintiff's activities.

---

**2.** Section 22. *Refusal, revocation of license.*

Upon the approval of the Mayor, the Treasurer shall have full power and authority to refuse to grant licenses under the provisions of this Article, and also, when directed by the Mayor, shall have full power and authority to revoke any license granted by virtue of this Article. [Subsequent amendment changed "Treasurer" to "Director of Finance."]

**3.** Section 71 (b). *Amusement arcades.*

Provided, that for any premises operated within the City of Baltimore licensed as an amusement arcade, having fifteen (15) or more claw machines, bowling machines, shuffle board machines, pinball machines, pool tables, console machines, target machines, baseball machines, and other similar devices operated or activated by coin or token the total sum due and payable for a license under this subtitle to operate all of said devices shall be twelve hundred dollars ($1,200.00) per annum.

**4.** Section 71 (g). *Rules and Regulations.*

In order to properly carry out and enforce the provisions of this section and to collect the license fees levied and imposed under this section, the City Treasurer is hereby authorized and empowered to make, adopt, promulgate and amend, from time to time, such rules and regulations as he may deem necessary or proper to carry out and enforce the provisions of this section and to fully collect the license fees imposed under this section, and to define or construe any of the terms and provisions used in this section.

## CONCLUSIONS OF LAW

Plaintiff attacks the constitutionality of this ordinance on a number of grounds: that the ordinance acts as a prior restraint on First Amendment rights, is overly broad and vague, lacks procedural safeguards, gives administrative officials unlimited discretion, is class legislation, and further, that the application of the ordinance has been unconstitutional due to discriminatory enforcement, suppression of First Amendment materials, unequal taxation and harassment by City officials.

Plaintiff's standing to challenge the constitutionality of this ordinance is uncontested by defendants. In the area of freedom of expression, challenges that regulatory ordinances confer overly broad discretion to licensing officials are favored, and

> In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license. "One who might have had a license for the asking may * * * call into question the whole scheme of licensing when he is prosecuted for failure to produce it."

*Freedman v. Maryland*, 380 U. S. 51, 56 (1965).

Although Star has not been prosecuted for failure to obtain the required licenses, he has been threatened with prosecution; further, revocation of licenses under this ordinance have occurred and the power to refuse or revoke these licenses may have a "chilling effect" on plaintiff's exercise of freedom of expression. The potency of such threats to freedom of expression has been recognized in *United Steelworkers (AFL-CIO) v. Bagwell*, 383 F. 2d 492 (4th Cir. 1967), where a union organizer was found to have standing to challenge the constitutionality of an anti-littering ordinance that was held out as requiring a

permit for his union activities even though he had never applied for such a permit, or been denied one, and had never been prosecuted for failure to obtain a permit. However, he had been threatened with prosecution under the ordinance and such a threat in the area of First Amendment rights was held to be inhibitory of free exercise, giving him standing to challenge the licensing provisions.

Films shown in these coin-operated machines are protected under the First Amendment as motion picture films, " * * * expression by means of motion pictures is included within the free speech and free press guarantee of the First and Fourteenth Amendments." *Joseph Burstyn, Inc. v. Wilson*, 343 U. S. 495, 502 (1952). It would seem anomalous to distinguish between motion pictures shown in motion picture theaters and those shown in coin-operated machines as far as the breadth of the First Amendment is concerned, and we do not. Other courts considering this question have refused to make the distinction. *414 Theater Corp. v. Murphy, et al.*, 73 Civil No. 22, Memorandum Opinion No. 39641 (S.D.N.Y., filed June 29, 1973); *Soof v. City of Highland Park*, 30 Mich. App. 400, 186 N.W.2d 361 (1971).

Plaintiff argues that the taxation imposed by section 71 (a) (1) is invalid since it taxes freedoms guaranteed by the First Amendment. Certainly taxation as well as any regulation in the First Amendment area meets stiff judicial scrutiny; however, commercial enterprises dealing in First Amendment materials or exercising First Amendment rights are not immune from reasonable taxation. *Grosjean v. Am. Press Co.*, 297 U. S. 233 (1935) (newspapers); *Chemline Inc. v. City of Grand Prairie*, 364 F. 2d 721 (5th Cir. 1966) (movie theater); *City of Corona v. Corona Daily Independent*, 115 Cal. App. 2d 382, 252 P. 2d 56, *cert. den.*, 346 U. S. 833 (1952); *Soof, supra* (coin-operated movie machines).

*Grosjean* held that the destructive effect of the taxation on the breadth of newspaper circulation made the tax impermissible. Similarly, in *Murdock v. Pennsylvania*, 319 U. S. 105 (1943), the Court found that the tax imposed on

those soliciting door-to-door served to restrict freedom of religion of religious colporteurs seeking to distribute literature, thereby spreading their faith. The Court in *Murdock* drew a strong distinction between such ordinances regulating commercial enterprises and those regulating non-commercial enterprises. In *Murdock* it is clear that the effect of the tax on the enterprise — not its form — must be examined to see if the tax restricts free exercise. "It is true that the First Amendment, like the commerce clause, draws no distinction between license taxes, fixed sum taxes, and other kinds of taxes. But that is no reason why we should shut our eyes to the nature of the tax and its destructive effect." 319 U. S. at 113.

Businesses such as plaintiff's are subject to reasonable, non-confiscatory taxation. In view of the absence of any showing of hardship by plaintiff or inability to pay the tax and the evidence that proprietors with such machines uniformly pay this tax, the tax is neither unreasonable nor discriminatory.

Plaintiff questions the legitimacy of purpose in the taxation, suggesting that the tax must be limited to an amount calculated to defray the administration of licensing and related activities. The City contends that it has broad authority to tax businesses within its jurisdiction, citing *McBriety v. Baltimore*, 219 Md. 223, 148 A. 2d 408 (1958), and admits that this ordinance provides revenue to the City. (PX-1, p. 19)

Certainly businesses engaged in activities protected by the First Amendment are not immune from contribution to the increased costs to the City for upkeep and added services required as a result of business operations, even though they deal in First Amendment materials. As long as the taxation is uniform and reasonable, and non-discriminatory, the City's purpose in seeking additional operating revenue through these licensing ordinances is valid. The court considered this issue in *Soof, supra*, stating at page 364, "The commercial entrepreneur can legitimately be subjected to license regulations which, for example, require a reasonable, non-confiscatory license fee to provide

additional revenue to offset increased municipal expenses resulting from the licensee's operation," and in *City of Corona v. Corona Daily Independent, supra,* the court found a non-discriminatory tax levied on newspapers as well as other business, for the sole purpose of maintaining the municipal government, was constitutional.

Plaintiff's challenge to the ordinance is based on the alleged overbreadth of discretion granted to licensing officials. He contends that section 22 has been applied to section 71 of Article 15 in the past and can be applied to him in the future, thus having a "chilling effect" on his activities since the discretion is unlimited, without standards, and lacks procedural safeguards. It is clear that any licensing of First Amendment activities requires close examination, and licensing that allows an official to refuse or revoke a required permit must set forth limits to this discretion, standards to judge the objectivity of the licensing process, and procedural safeguards that provide for redress. *Niemotko v. Maryland,* 340 U. S. 268 (1950); *Cox v. New Hampshire,* 312 U. S. 569 (1941).

> It is well settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official — as by requiring a permit or license which may be granted or withheld in the discretion of such official — is unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub v. Baxley,* 355 U. S. 313, 322 (1958).

A literal reading of section 22 would seem to make it applicable to section 71 as well as to the other sections of Article 15; however, the indexing and treatment of the sections make the applicability less certain. Article 15 is a general licensing article with 90 sections. Five other divisions of Article 15 have separate sections providing for revocation or refusal of licenses. Under "Ambulances" (section 5), the Commissioner of Health is empowered to

revoke licenses of ambulance drivers where carelessness is shown. Section 26 (o) deals with the suspension of a bail bond license by the Bail Bond Board "for any cause which would be sufficient for denial of the license * * *." Similarly, sections 40, 41 and 45 deal with the authority of the Director of Traffic to refuse, revoke or suspend licenses granted under the provisions of Article 15 that deal with "Drivers Schools." Sections 67 and 86 give the Mayor power to grant or revoke, respectively, a pawnbroker's license if "sufficient cause is shown" and a produce wholesaler's license if it is shown that the licensee is in violation of the applicable licensing provisions.

Section 71 stands independent of other sections of Article 15, having its own separate enforcement provisions that allow the Director of Finance to adopt and promulgate rules and regulations for the collection of fees (71-g) and a separate section dealing with penalties (71-h). By construing section 71 as a section that allows no discretion in granting, refusing or revoking a license, only non-payment of the fee can result in non-licensing and no licensing standards or procedural safeguards are needed. Such an interpretation is not only plausible from the construction of Article 15, but is necessary if section 71 is to stand and follows the "venerable principle" of construing a provision so as to avoid doubtful constitutionality. *United States v. Bradley*, 418 F. 2d 688, 691 (4th Cir. 1969).

For the reasons herein set forth, Baltimore City Code, Art. 15, § 71 (a) (1) is constitutional on its face and as applied to the plaintiff.

It is, therefore, this 26th day of September 1973,

ORDERED by the United States District Court for the District of Maryland, that judgment be and hereby is entered in favor of the defendants.

> /s/ Joseph H. Young
> United States District Judge