944 A.2d 1183

Susan **RUNNELS**, et al.

v.

Jonathan G. **NEWELL**, et al.

No. 1374, Sept. Term, 2006.

Court of Special Appeals of Maryland.

March 28, 2008.

172

178

Thomas X. Glancy, Jr. (Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Deborah A. Jeon on the brief), Baltimore, for Appellant.

William F. Brockman, Linda S. Woolf (K. Nicole Nesbitt, Goodell, DeVries, Leech & Dann, LLP, Douglas F. Gansler, Atty. General on the brief), Baltimore, for Appellee.

Panel: SALMON, SHARER and WILLIAM W. WENNER (Ret., Specially Assigned), JJ.

SALMON, Judge.

In 2000 Robert Greenleaf was appointed State's Attorney for Caroline County, Maryland. He secured the Democratic nomination and ran for election for that job in November 2002. Of the ten employees of the Caroline County State's Attorney's office, three actively campaigned for Mr. Greenleaf, viz.: Susan Runnels, Marjorie Cooper, and Delores McBride, Esq., an Assistant State's Attorney. Mr. Greenleaf was defeated at the polls on November 5, 2002, by Jonathan G. Newell.

About five weeks after his election victory, Mr. Newell had a meeting with Ms. Runnels, Ms. Cooper, and Ms. McBride. He told the trio that they would be terminated when he took office as State's Attorney for Caroline County on January 6, 2003. Except for the three employees of the State's Attorney's Office who had supported Mr. Greenleaf's candidacy, no one else was terminated by Mr. Newell prior to his taking office.

Ms. Runnels and Ms. Cooper brought suit in the Circuit Court for Caroline County and requested a jury trial. The defendants were Mr. Newell, the County Commissioners for Caroline County, and the State of Maryland. The case was later removed to the Circuit Court for Worcester County.

In their complaint, which contained seven counts, the plaintiffs made two major allegations in Counts I–III. First, it was alleged that Mr. Newell deprived the plaintiffs of their rights (guaranteed by the First Amendment to the Constitution of the United States and by Article 40 of the Maryland Declaration of Rights to participate freely in political activities and to express their political views) when they were fired in retaliation for the political support they gave to Mr. Greenleaf. Second, the County Commissioners for Caroline County and

the State of Maryland were alleged to be liable jointly for Mr. Newell's illegal action in firing them in retaliation for their political activities.

The plaintiffs also alleged in their complaint that while they were employed at the State's Attorney's Office for Caroline County, they were required to work in excess of forty hours per week, but that, contrary to the Fair Labor Standards Act (FLSA) and certain Maryland wage and hour laws that correspond to the FLSA, they were not paid time and one-half for the hours they worked in excess of forty hours per week; instead they were given compensation time, meaning that they were granted leave equal to the amount of time they worked in excess of forty hours per week. According to plaintiffs, the County was liable for these statutory violations.

In response to the overtime issue, the County took the position that, even if the plaintiffs could show that they were unlawfully required to accept compensation time in lieu of time and one-half pay, it was not liable because it was not plaintiffs' employer within the meaning of the controlling statutes.

The motions judge granted the County's motion to dismiss portions of Counts I, II, and III. Subsequently, after extensive discovery, the motions judge granted summary judgment in favor of all defendants as to all counts. In this appeal, Ms. Runnels and Ms. Cooper argued that the trial judge erred in granting summary judgment against them.

## I.

### A. Facts Relevant to the Issue of Liability for the Termination of the Appellants [1]

#### 1. Marjorie Cooper

■ Christian J. Jenson commenced his term as State's Attorney for Caroline County in January of 1987. He served

1. In deciding whether a motion for summary judgment was properly granted, an appellate court analyzes the facts, including all inferences

as State's Attorney until June of 2000, when he resigned. During Mr. Jenson's first year in office, he hired, as his first victim's witness coordinator ("VWC"), Marjorie Cooper. While performing that job, Ms. Cooper met expectations in each of her annual evaluations. She was selected as the VWC of the year for the State of Maryland near the end of Mr. Jenson's tenure as State's Attorney. In October 2001, Ms. Cooper became the senior District Court coordinator for the Caroline County State's Attorney's Office.

Ms. Cooper earned $14.58 per hour when she was fired. As the senior District Court coordinator, she did not report directly to the Caroline County State's Attorney; instead, she reported to the administrative coordinator, who, in turn, reported to the Deputy State's Attorney. The Deputy State's Attorney reported to the State's Attorney.

As senior District Court coordinator, Ms. Cooper's duties included reviewing dockets, pulling case files, subpoenaing witnesses, ordering documents, filing, and performing other tasks as directed by the attorney assigned to her cases. She also provided clerical support for prosecuting attorneys. In addition, Ms. Cooper served as the VWC for juvenile cases and occasionally filled in for other victim witness coordinators when they were absent.

### 2. Susan Runnels

In 2000, Mr. Greenleaf hired Ms. Runnels to be a District Court (assistant) VWC. Ms. Runnels performed her job well, as evidenced by the fact that she received a performance bonus from Caroline County in 2001. She was selected as the

---

that legitimately may be drawn from those facts, in the light most favorable to the party against whom summary judgment was granted. *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 658 A.2d 675 (1995). Accordingly, in Part A–1 of this opinion, the facts are set forth in the light most favorable to Ms. Runnels and Ms. Cooper. It should be stressed, however, that many of those facts are disputed by the appellees in this case, who are: Jonathan G. Newell, the State of Maryland, and the County Commissioners for Caroline County, Maryland. The defendants presented evidence to the motions court that, if credited by a jury, justified disposition in favor of appellees.

outstanding employee of the year for the Caroline County State's Attorney's office in 2002, the year in which she was fired.

Ms. Runnels enjoyed a good relationship with Mr. Newell until July 2002 when she agreed to work for Mr. Greenleaf's election. After Ms. Runnels commenced her campaign activities, Mr. Newell voiced a complaint to Donald Nagel, who was the chief of police for the Town of Federalsburg, Maryland, and is also the son-in-law of Ms. Runnels. According to an affidavit later filed by Mr. Nagel, on several occasions during the 2002 election campaign, Mr. Newell complained to him about Ms. Runnels' "open support for Mr. Greenleaf." "[Mr. Newell] told [Chief Nagel] on one or more occasions that Ms. Runnels 'must not like her job very much' to the extent that she was openly supporting Greenleaf." During the campaign, Mr. Newell also wondered aloud to Chief Nagel "why Ms. Runnels would put herself in [such a] position because it could be bad if Greenleaf lost."

The job description for a VWC states that it involves "clerical work" that is to be performed "as directed" and that is to be spot checked by his/her superior. No college or prior criminal justice experience is required.

The primary responsibilities of a VWC are two-fold: (1) to provide clerical support to prosecuting attorneys in connection with the criminal cases to which they are assigned and (2) to act as a liaison between the State's Attorney's office and crime victims. The trial-related responsibilities of the VWC include assisting the attorneys in the preparation of criminal informations, preparing subpoenas, scheduling meetings between witnesses and the prosecutor, advising witnesses and victims of changes in court dates, and confirming their attendance in court, calling witnesses to the courtroom during trial, and performing such other tasks as directed by the prosecutor assigned to the case. In the event that a VWC could not answer a victim's question, Ms. Runnels would schedule a meeting between the victim and the prosecuting attorney. A VWC is not permitted to give legal advice to victims, nor

provide substantive input regarding a victim's testimony or the preparation of victim impact statements.

The VWC sits three rungs below the State's Attorney in the Caroline County State's Attorney's Office organizational chart, reporting to the administrative coordinator as opposed to the State's Attorney. A VWC, such as Ms. Runnels, is supervised by the Deputy State's Attorney or the Assistant State's Attorney prosecuting the case to which the VWC is assigned. When she was absent, the office receptionist frequently assumed her duties. Ms. Runnels earned $11.30 per hour at the time of her dismissal.

During her tenure as a VWC, Ms. Runnels served on a "Hot Spots" committee made up of persons interested in community crime prevention. The committee was comprised of representatives of law enforcement and social service agencies, including the mayor of Federalsburg and the Deputy State's Attorney. According to Ms. Runnels' affidavit, her committee work, for the most part, consisted of listening to the views of other committee members and taking notes. Ms. Runnels volunteered to participate in the crime-prevention program because she lived in the community that it served, not because it fell within her responsibilities as an employee of the Caroline County State's Attorney's Office.

### 3. Campaign Activities of the Appellants

Ms. Cooper had no official role in Mr. Greenleaf's 2002 campaign for election. She did, however, overtly support Mr. Greenleaf's candidacy. She posted a Greenleaf sign in her yard and wrote a letter, favorable to him, that was published during the campaign in a local newspaper. Prior to the election, she handed out Greenleaf pins and brochures and, on occasion, wore a Greenleaf campaign shirt and button. Additionally, on election day, November 5, 2002, Ms. Cooper distributed literature for Mr. Greenleaf at a polling place.

During her spare time, Ms. Runnels served as Greenleaf's campaign manager and treasurer for the 2002 election campaign. In this capacity, she helped Mr. Greenleaf develop and

distribute campaign materials, wrote a letter to the editor of a local newspaper in which she espoused Mr. Greenleaf's candidacy, placed a Greenleaf campaign sign in her yard, and placed a Greenleaf bumper sticker on her car. Like Ms. Cooper, she also passed out Greenleaf campaign literature at a polling place on election day.

### 4. Post Election Activities

In early December 2002, Mr. Newell met with Charles Cawley ("Cawley"), the Caroline County Administrator. Mr. Newell told Cawley that he intended to fire Runnels, Cooper, and McBride. During the conversation, he did not criticize their job performance, nor did he ask to review their personnel files. Cawley suggested to Mr. Newell that he "give it some time before he [made] this decision, and [advised that] he [Newell] should probably evaluate their work performance before" he fired them.

On November 19, 2002, Ms. Runnels telephoned Mr. Newell to congratulate him on his electoral victory. She told Mr. Newell that she hoped he would retain her as a VWC when he assumed his new duties. Ms. Runnels also said that she had supported Mr. Greenleaf during the campaign out of loyalty to the State's Attorney's office but assured Mr. Newell that she would be just as loyal to him once he took office. Mr. Newell told her that he appreciated the call but gave her no assurances that she would keep her job.

At the meeting on December 13, 2002, during which they were fired, Mr. Newell told Ms. Cooper and Ms. Runnels that their termination had nothing to do with their job performance, nor was it due to any fault on their part. In fact, Mr. Newell told Ms. Runnels that she had been a good employee. When Ms. Runnels asked Mr. Newell why he fired her, he replied that he was keeping people he could "trust." This remark caused Ms. Runnels to accuse Mr. Newell of terminating her and her cohorts because of their support for Mr. Greenleaf. To this charge, Mr. Newell responded by smiling and stating "absolutely not." In Ms. Runnels' view, the last-mentioned answer was delivered in a "sarcastic" tone of voice

that she understood to mean the opposite of the words Newell spoke. When Ms. Runnels complained that Mr. Newell had not given her more notice of his intention to terminate her, Mr. Newell replied that she should have known the day after the election that she would not be keeping her job.

### 5. Post December 13, 2002, Events

After announcing that he was terminating Ms. Cooper and Ms. Runnels, Mr. Newell contacted the remaining non-lawyer employees of the Caroline County State's Attorney's office who had either supported him in the election or remained neutral and advised them that when he took over he intended to retain them as employees but intended to terminate the employment of Ms. Runnels, Ms. Cooper, and Ms. McBride. What happened next was well summarized by the motions judge as follows:

Following Newell's announcement, ... the other employees within the SAO (State's Attorney's office) began treating Runnels and Cooper disrespectfully and rudely. Gradually, [p]laintiffs' regular work was taken away from them and assigned to other employees. Moreover, [p]laintiffs were told that they must use all of their accumulated compensatory leave prior to their termination, or it would be lost, and they were specifically told by County personnel and payroll officials that they would not be compensated monetarily for compensatory leave time.

Accordingly, Runnels scheduled compensatory leave for the full day on December 16th as well as half days on December 17th and 18th. The SAO office administrator, Betsy LeCompte, approved Runnels' leave request, so she stayed off of work on December 16th. When Runnels returned to work on the morning of December 17th, her computer had been removed from her desk, and her phone had been re-routed so that it rang only at the desk of Rose Rice, the SAO District Court Victim Witness Coordinator.... Runnels ... went to County Administrator[ ] Charles Cawley's[ ] office to inquire about her computer and telephone. Cawley said that he had directed Runnels'

telephone line to be re-routed to Rice's desk because he did not like the message she had placed on her voice mail. The message left on her answering machine noted that she had been terminated and thereafter thanked and said goodbye to those she had worked with during her tenure at the SAO. Cawley further informed Runnels that her computer had been removed because he had been informed by someone at the SAO that Runnels had quit her employment and that she had erased all of the files from her computer.

Runnels protested that she had done no such thing[ ] and informed Cawley that she had been on compensatory leave the previous day with the approval of the SAO office administrator. She assured Cawley that no files had been removed from her computer, and complained that no one had confronted her about this issue before confiscating her computer. Cawley responded that County employee Jim McCormick had checked Runnels' computer and confirmed that it held no files in the Word Perfect program. That was true, Runnels said, because all of her files were in Microsoft Word, which she alleges she could have told him. Mr. McCormick eventually verified that all of Runnels' files were indeed intact on her computer and were in fact saved in Microsoft Word. Accordingly, Cawley directed that Runnels' computer be returned to her office and told Runnels[ ] it was a good thing she had come to this office, because otherwise he would have terminated her from County employment and deemed her not eligible for future County employment.

Upon Runnels['] return to her desk, however, her telephone remained so that it routed all calls to Ms. Rice. Moreover, from that day until the conclusion of her employment with the SAO on January 6, significant portions of her regular work were assigned to others in the office so that she was sometimes forced to sit idly at her desk. Other workers and officials at the courthouse told Runnels that they had heard through the grapevine that she had quit her job and erased all of her files from her computer.

## B. *Mr. Newell's Version of Events*

Mr. Newell testified at deposition that many months before the election he decided that he would not retain appellants—if elected. This decision was based on his experiences with the appellants from September 1990 through 1991, when he was a Caroline County Assistant Public Defender. The brief of the State and Mr. Newell summarized Newell's reasons as follows:

Mr. Newell found Ms. Runnels "to be at times nasty, aloof, arrogant, [and] dismissive." At times, "she was fairly derogatory concerning clients of [Newell's], [and] spouses of clients...." Ms. Runnels "would say things such as 'Don't ask me, that's not my job description. Don't ask me, I only work here.'"

During this period, Mr. Newell came to believe that Ms. Runnels was misinforming spouses of clients accused of domestic violence about their duty to testify. He explained that "[i]t so oftentimes happens they might have reconciled by the time the trial came along. The wife would say I just went and told them I didn't want to testify and they told me I couldn't." When Mr. Newell would ask the spouse who had said this, the reply was sometimes Ms. Runnels. Mr. Newell also found Ms. Runnels' practice of attempting to speak to his clients outside of his presence to be particularly objectionable. He further suspected that, on at least one occasion, Ms. Runnels had, in the course of "floating" in and out of the courtroom, violated the sequestration rule by providing a sequestered witness with information that was crucial to the State's case.

... Newell testified that he also had the opportunity to observe Ms. Cooper at her job and, in the course of so doing, had formed a similar impression about her. He stated that Ms. Cooper commonly failed to issue subpoenas to witnesses, which resulted in cases in which she assisted being postponed. Mr. Newell also observed Ms. Cooper seemingly "coming and going when she wanted to ... smoking cigarettes out front, hiking up and down the street, talking about going to get her nails done." He states that the first time he met Ms. Cooper, "she was sitting at her

desk and she had this sort of display of these Avon or Mary Kay [products] or something, and she asked [him] if [he] wanted to buy some stuff for [his] wife." . . . Newell recalls "sort of being taken aback" upon learning that the sales were for her own business. Mr. Newell also heard Ms. Cooper using profane language on multiple occasions in the hallways and in the State's Attorney's Office.

(References to extract and appendix omitted.)

### C. *Material Presented to the Motions Judge Contradicting Mr. Newell's Testimony*

In her affidavit, Ms. Runnels contradicted many of the allegations made by Mr. Newell in his deposition, viz:

22. During my tenure at the SAO (State's Attorney's Office), I never violated a sequestration order, told a victim or other witness whether that they must testify or that they were not permitted to testify against a spouse, nor did I speak with a criminal defendant in an attempt to obtain information about the crime with which he was charged.

23. I had very little direct contact with Jonathan Newell in fulfilling my duties as Victim Witness Coordinator. The limited contact I had with him was insufficient for him to make an informed decision with respect to my job perform- ance. To the extent that I did interact with Jonathan Newell, we had a good professional relationship up until the time I decided to support Robert Greenleaf's candidacy for State's Attorney.

24. I always treated Jonathan Newell with courtesy and respect, and was never arrogant, nasty, dismissive, nor rude to Mr. Newell nor to his clients. I never responded to any of his requests with the statement that it was "not my job" nor did I ever tell him that what he was requesting "did not fall within my job description."

25. Mr. Newell never complained to me about my job performance nor the way I treated his clients or him.

26. Jonathan Newell and I attended the Maryland State's Attorney Convention that was held in Ocean City,

Maryland, in June of 2002, approximately one month before I became Robert Greenleaf's campaign manager and treasurer. Mr. Newell approached me at a breakfast at that convention and asked me if an empty seat next to me was taken. When I told him that it was not, Mr. Newell then sat down beside me and we had a very cordial conversation. I also attended a dinner that evening with my daughter and my nephew, which Mr. Newell attended with his wife. Mr. Newell introduced his wife to my daughter and they sat down at a booth next to our table. Once again, we had a very cordial conversation. There was nothing in his actions nor his manner to suggest any dissatisfaction on his part with my performance as a Victim Witness Coordinator nor any discomfort about our personal or professional relationship. I had no concerns at that time that Mr. Newell would terminate me if he replaced Robert Greenleaf as State's Attorney for Caroline County.

27. When I became Robert Greenleaf's campaign manager and treasurer in July, 2002, friends and relatives began to warn me that my job might be in jeopardy as a result of my public support of Mr. Greenleaf in the event Jonathan Newell was elected State's Attorney. Although I became concerned about my job security, I continued to believe that my strong job performance as a Victim Witness Coordinator would cause Jonathan Newell to retain me if he was elected.

Appellants also placed other facts before the motions court that, if believed, cast doubt on the truthfulness of Mr. Newell's testimony as to his motivation. Aside from the facts set forth in 1.A, *supra,* material was put before the court showing that Newell campaigned on a platform of leaving things intact at the State's Attorney's Office as opposed to making personnel changes. He said so publicly at campaign events and in private conversations. Additionally, a neutral witness at the meeting at which appellants were fired said that Mr. Newell told appellants and Ms. McBride that he was terminating them through "no fault of their own."

## II. *COUNT I*

Did the motions judge err in granting summary judgment in favor of all defendants as to Count I of plaintiffs' complaint, which was filed pursuant to 42 U.S.C. section 1983?

Section 1983 of Title 42 of the United States Code provides: Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Section 1983 claims, at the option of the plaintiff, may be brought in State court. *Martinez v. California,* 444 U.S. 277, 283–84 n. 7, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980).

In *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 716–17, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), Justice Kennedy, speaking for a unanimous Court, said:

The Court has rejected for decades now the proposition that a public employee has no right to a government job and so cannot complain that termination violates First Amendment rights, a doctrine once captured in Justice Holmes' aphorism that although a policeman "may have a constitutional right to talk politics ... he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517 (1892). A State may not condition public employment on an employee's exercise of his or her First Amendment rights. *See, e.g., Keyishian v. Board of Regents of Univ. of State of N.Y.,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *See also Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. [668,] 674–675, 116 S.Ct. [2342], 2347, 135 L.Ed.2d 843 [ (1996) ] (collecting cases). As we have said: "[I]f the

government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." *Perry v. Sindermann, supra,* at 597, 92 S.Ct. at 2697 (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). Absent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression.

■ The right of a public employee to speak freely and to participate in public affairs may, in some instances, be governmentally proscribed. *Bd. of County Comm'rs, Wabaunsee County v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). As explained by the Maryland Court of Appeals in *O'Leary v. Shipley,* 313 Md. 189, 545 A.2d 17 (1988), there are two tests that are to be applied by courts called upon to determine whether the political activity or speech of a public employee is protected. The test that is normally used is called the *Pickering–Mt. Healthy* test, which is shorthand for the test that originated in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In *Pickering,* a schoolteacher sued for reinstatement after the school board fired him for sending a letter critical of school board policy to a local newspaper. In an opinion by Justice Marshall, the Court held that the school board could not deprive Pickering of his right as a citizen to comment on matters of public concern. At the same time, however, the Court recognized that the state has an interest in regulating the speech of the teachers it employs. Accordingly, the Court adopted a balancing test to determine whether the state had constitutionally discharged Pickering. "The problem in any case," the Court wrote, "is to arrive at a balance

between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Pickering* determined the extent of the state's efficiency interest on the basis of several important considerations, including (1) the speech's effect on discipline by the employee's immediate supervisors; (2) its effect on harmony among the employee's co-workers; (3) whether the relationship between the employee and the employer against whom he spoke was a close one which required personal loyalty or confidence; (4) the speech's effect on the employee's job performance; and (5) its impact on the general operation of the employer's enterprise. The Court found that all of these factors favored the teacher on the facts of *Pickering;* therefore, the school board acted unconstitutionally in firing him.

Craig D. Singer, *Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Affiliation*, 59 U. Chi. L.Rev. 897, 899–900 (1992) (footnotes omitted).

■ In *Mt. Healthy*, the Supreme Court provided new guidance as to how to apply the *Pickering* balancing test, particularly as to the correct placement of the burden of proof. The public employee must first prove that his conduct was constitutionally protected and that the conduct was a "substantial or motivating factor" in the employer's decision to take an adverse job action against the employee. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568. If the employee meets this burden, then the employer may still avoid liability if it can prove "by a preponderance of evidence that it would have reached the same decision ... even in the absence of the protected conduct." *Id.*

In *O'Leary*, the Court cited two Supreme Court decisions to illustrate when speech by a government employee is, and when it is not, constitutionally protected, viz.: *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97

L.Ed.2d 315 (1987). *Connick v. Myers* made explicit what had been implied in *Pickering,* i.e., that the balancing test applies only when the employee's speech touches on a matter of public concern. 461 U.S. at 146, 103 S.Ct. 1684.

The *O'Leary* Court said:

In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), a former assistant district attorney contended that her employment was terminated because of a questionnaire she distributed to other assistant district attorneys in her office. Finding that most of the questions on the questionnaire did not concern matters of public concern, and thus did not trigger constitutional scrutiny, the Court stated:

"When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." 461 U.S. at 146, 103 S.Ct. at 1690.

With respect to one question that did fall under the rubric of matters of public concern, the Court, although noting that the First Amendment " 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' " 461 U.S. at 145, 103 S.Ct. at 1689 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)), struck the balance for the government. It held that[,] given the context in which the questionnaire was distributed, it had great potential to undermine authority and destroy working relationships. This concern, the Court held, outweighed the limited First Amendment interests the questionnaire represented. *Id.* at 154, 103 S.Ct. at 1693.

In *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), by contrast, the Court found for the public employee. In that case a clerical employee in a county constable's office was discharged for a political remark made to a co-employee during a private conversation. The Court, noting that there was no evidence that the statement either interfered with the efficient functioning of the office or had a detrimental effect on the working relationship between the clerical employee and the constable, held that the constable had not met his burden under *Pickering*. 107 S.Ct. at 2899–90.

*O'Leary,* 313 Md. at 201–02, 545 A.2d 17.

In *Rankin,* the Court said that in weighing the state's interest "some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." 483 U.S. at 390, 107 S.Ct. 2891. Therefore, the *Rankin* Court concluded, where "an employee serves no confidential, policymaking, or public contact role" *(id.* at 390–91, 107 S.Ct. 2891), an employer's interest in firing him is small because "the danger to the agency's successful functioning from that employee's private speech is minimal." *Id.*

■ The *Pickering–Mt. Healthy* test is inapplicable when a public employee is discharged for political patronage reasons alone. *O'Leary,* 313 Md. at 204, 545 A.2d 17. In such cases, what is called the *Elrod–Branti* test is applicable. The last-mentioned test is based upon language used in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

In *Elrod,* the Republican sheriff of Cook County, Illinois, was defeated in an election and was replaced by Richard Elrod, a Democrat. Elrod promptly discharged several employees of the sheriff's department solely because they (1) did not support the Democratic party or (2) had failed to obtain the sponsorship of a prominent Democratic leader. In *Elrod,*

the Supreme Court held that the discharged employees stated a valid constitutional claim, inasmuch as patronage dismissals of that type compel political orthodoxy and restrain political association, and thus are " 'at war with the deeper traditions of democracy embodied in the First Amendment.' " 427 U.S. at 357, 96 S.Ct. 2673 (quoting *Illinois State Employees Union v. Lewis*, 473 F.2d 561, 576 (7th Cir.1972)). The *Elrod* Court also said that, except for dismissals from policy-making positions, patronage discharges are forbidden inasmuch as the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, especially his interest in freedom of speech." *Id.* at 359, 96 S.Ct. 2673 (quoting *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).

> [T]he *Elrod* test does not require balancing on a case by case basis. Rather, the Supreme Court performed the balancing and concluded that the state's interest in employing politically loyal personnel is protected by a categorical test limiting dismissals to policymaking positions. Therefore, courts only have to decide whether an employee holds a policymaking or non-policy-making position to determine if a dismissal based solely on his political affiliation violates his First Amendment rights.

Amy C. Lohr, *Employer's Motivations: The Framework for Analyzing First Amendment Rights of Political Activity in O'Hare*, 8 Geo. Mason U. Civ. Rts. L.J. 65, 73 (1997).

The *Branti v. Finkel* case was summarized by the *O'Leary* Court as follows:

> In *Branti v. Finkel*, decided in 1980, the Court considered whether the holding in *Elrod* was limited to situations in which government employees are coerced into pledging allegiance to a political party or whether it also applies to a simple requirement that an employee be sponsored by the party in power. In that case two county assistant public defenders brought a civil rights action alleging that Branti, the newly appointed public defender, was about to discharge them solely because they were Republicans. The assistant public defenders sought and were granted an injunction by

the federal district court on the basis of *Elrod.* On appeal Branti contended that *Elrod* should be read to prohibit only dismissals resulting from an employee's failure to capitulate to political coercion. Rejecting this notion, the Court stated:

> "[T]here is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance. To prevail in this type of an action, it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged 'solely for the reason that they were not affiliated with or sponsored by the Democratic Party.'" 445 U.S. at 517, 100 S.Ct. at 1294.

*O'Leary,* 313 Md. at 197–98, 545 A.2d 17.

In *Branti v. Finkel,* the Supreme Court modified the test for determining when the state may discharge employees due to political affiliation. The Supreme Court did not discard the categorical distinction it had recognized among employees. Rather, the Supreme Court shifted the focus from whether the employee is in a confidential position or a policymaking position to "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."

Lohr, *supra,* 8 Geo. Wash. L.Rev. Civil Rts. L.J. at 73 (footnotes omitted).

In *O'Leary,* the Court of Appeals was required to decide whether the case before it called for the application of the test set forth in the *Elrod–Branti* line of cases or whether the test to be applied was that set forth in the *Pickering–Mt. Healthy* line.

The facts in *O'Leary* were somewhat similar to ones presented in the case *sub judice.* Diane O'Leary, a deputy clerk of the Circuit Court for Carroll County, ran against Larry Shipley, the incumbent clerk of that court. *O'Leary,* 313 Md. at 190–91, 545 A.2d 17. Mr. Shipley won re-election and, on the day of his investiture, informed Ms. O'Leary that he would

not reappoint her as a deputy clerk. *Id.* Ms. O'Leary sued Shipley. A motion to dismiss the complaint was filed by Shipley. *Id.* at 191–92, 545 A.2d 17. Shipley relied on the *Elrod–Branti* line of cases and contended that in order for Ms. O'Leary to prevail she was required to prove that he had failed to reappoint her based solely on a political-patronage motive. *Id.* at 192, 545 A.2d 17.

In *O'Leary,* Chief Judge Robert Murphy, for the Court, provided a scholarly and extensive review of the pertinent authorities concerning what tests should be applied when a governmental employee is discharged due to the exercise of his or her First Amendment right to participate in elections. *Id.* at 195–205, 545 A.2d 17. The *O'Leary* Court said that the trial judge had inappropriately applied the *Elrod–Branti* line of cases. In the view of the Court of Appeals, "the *Elrod–Branti* test is a narrow and somewhat rigid one ... and is aptly applied only to a set of facts that, as a threshold matter, show *political patronage as the sole motive of a discharge.*" *Id.* at 205, 545 A.2d 17 (emphasis added). The Court ruled that the facts surrounding O'Leary's firing did not show "political patronage as the sole motive" of the discharge. *Id.* Judge Murphy explained:

> [I]t was apparent from the outset that O'Leary *was alleging that her overt expressive conduct in challenging Shipley in the election was considered by Shipley and played a role, if not the sole role, in Shipley's employment decision.* The appropriate test, therefore, was either *Pickering* alone or the combined *Pickering–Mt. Healthy* procedure, depending on whether permissible motives were involved in the discharge along with the allegedly impermissible ones. *Once evidence was adduced of both permissible and impermissible motives, it became manifest that the Mt. Healthy procedure was the proper one.*
>
> In accordance with *Mt. Healthy,* it should have first been determined by a *Pickering* balancing test whether O'Leary's remarks during her campaign for Clerk were constitutionally protected. If they were, the court should have determined whether this protected conduct was a

substantial factor in Shipley's decision not to reappoint O'Leary. If these issues were resolved in O'Leary's favor, Shipley should have been given the opportunity to show by a preponderance of the evidence that, even absent his consideration of this protected conduct, O'Leary would not have been reappointed. The trial court, however, determined only that Shipley's decision was not motivated *solely* by political patronage considerations. The wrong test having been applied, essential questions remain unresolved, and a new trial must be ordered.

*Id.* at 205–06, 545 A.2d 17 (emphasis added).

Eight years after *O'Leary*, the Supreme Court decided *O'Hare Truck Serv. Inc. v. City of Northlake, supra.* One of the petitioners in *O'Hare* was a towing company that did business with the City of Northlake, Illinois. The owner of the towing company, John Gratzianna, in 1993 supported an opponent of the incumbent mayor. 518 U.S. at 715–16, 116 S.Ct. 2353. Gratzianna not only refused to contribute to the incumbent mayor's campaign but allowed campaign posters of the person challenging the mayor to be placed on his company's premises. *Id.* When the incumbent was re-elected, Gratzianna's company was removed from the list of companies allowed to do towing work for the city. *Id.* Gratzianna and his company sued the city (and others), alleging that the company's removal from the list was in retaliation for Gratzianna's support of the unsuccessful mayoral candidate. *Id.* The Court of Appeals for the Seventh Circuit, based on the pleadings, considered the case as "simply an affiliation" case. *Id.* at 720, 116 S.Ct. 2353. The Supreme Court reached a different result, however. *Id.* The Court ruled that First Amendment protection was extended not only to government workers but also to independent contractors. *Id.* at 720–21, 116 S.Ct. 2353. Ultimately, the Court remanded the case with instructions to decide whether the case was governed by the *Elrod–Branti* rule or the *Pickering* rule. *Id.* at 726, 116 S.Ct. 2353.

In the course of its opinion, the *O'Hare* Court said:

We also modified [in *Branti v. Finkel]* the standard, announced in the two opinions supporting the *Elrod* judgment, for assessing when party affiliation, consistent with the First Amendment, may be an acceptable basis for terminating a public employee: *"[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."* 445 U.S. at 518, 100 S.Ct. at 1295.

Our cases call for a different, though related, inquiry where a government employer takes adverse action on account of an employee or service provider's right of free speech. There, we apply the balancing test from *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., supra. See generally Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. at 675–678, 116 S.Ct. at 2347–2349. *Elrod and Branti involved instances where the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the requirement was appropriate for the employment in question. There is an advantage in so confining the inquiry where political affiliation alone is concerned, for one's belief and allegiances ought not to be subject to probing or testing by the government.* It is true, on the other hand, as we stated at the outset of our opinion, *supra,* at 2355, that the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. *A reasonableness analysis will also accommodate those many cases, perhaps including the one before us, where specific instances of the employee's speech or expression, which require balancing in the Pickering context, are intermixed with a political affiliation requirement. In those cases, the balancing Pickering mandates will be inevitable.* This case-by-case process will allow the courts to consider the necessity of according to the government the discretion it

requires in the administration and awarding of contracts over the whole range of public works and the delivery of governmental services.

*Id.* at 718–20, 116 S.Ct. 2353 (emphasis added).

The just-quoted excerpt from *O'Hare* suggests that the *O'Leary* Court was correct when it held that the *Elrod–Branti* test is only properly applied "to a set of facts that, as a threshold matter, show political patronage as the sole motive of a discharge." 313 Md. at 205, 545 A.2d 17.

In the case *sub judice,* the appellants contend that they, like Mrs. O'Leary, were fired not because of their political affiliation (Ms. Runnels is a Republican, Ms. Cooper is a Democrat), but because of their overt expressive conduct in supporting a candidate who did not convince the voters that he should be elected. Appellants contend that if the *Pickering–Mt. Healthy* test had been applied, as it should have been, then summary judgment should have been denied as to Mr. Newell.

The motions judge agreed that if he applied the *Pickering–Mt. Healthy* test then he should deny Mr. Newell's motion for summary judgment. The motions judge also agreed with appellants that *O'Leary* was a "similar case" to the one *sub judice.* Nevertheless, he declined to follow the dictates of *O'Leary* for the following reasons:

> While the Maryland Court of Appeals applied the *Pickering–Mt. Healthy* test to a similar case in the past, the Court of Appeals was merely interpreting and applying federal law. When applying federal law, federal case law is highly persuasive in it's [sic] analysis. Thus, [p]laintiffs['] assertion, that *O'Leary* sets forth controlling precedent for this court, is not entirely correct. This [c]ourt recognizes that it is bound by Maryland precedent[;] however, it will note that it is not set in a vacuum or a tunnel as it looks at how the law is applied around the country. This is especially true when addressing federal questions of law. *The simple fact is that the Maryland Court of Appeals has not addressed a similar issue in nearly twenty years.* Over that time the *Elrod–Branti* test has undergone considerable alterations.

In particular, that test now looks *at the social and political roles of the complaining party within their offices.* Further, the courts have expanded the policymaking and confidential position analysis *to include those that exercise discretion in implementing policy.* See *Wilbur v. Mahan,* 3 F.3d 214, 217 (7th Cir.1993). Such factors are clearly implicated here. Thus, after careful analysis of all of the case law cited and legal arguments outlined within the Memoranda of Law, this [c]ourt finds that the *Elrod–Branti* test is the most appropriate test to apply given the facts of this case.

(Emphasis added.) (Footnotes omitted.)

Ultimately, the motions judge ruled that appellants' political activities were constitutionally unprotected inasmuch as Mr. Newell "had an absolute right to manage his office as he saw fit" and therefore could fire appellants.

As noted by the motions judge, since *O'Leary* was decided, several of the federal circuits, including the Fourth Circuit, have expanded the category of cases where the *Elrod–Branti* test is to be applied. For instance, in *Rose v. Stephens,* 291 F.3d 917, 921 (6th Cir.2002), the Sixth Circuit expanded the political patronage exception "to apply to situations when a confidential or policymaking public employee is discharged on the basis of political or policy-related speech." *See* Whitney C. Gibson, *Rethinking the Sixth Circuit's Erosion of First Amendment Rights in Rose v. Stephens,* 72 U. Cin. L.Rev., 767, 768 (2003). *See also Upton v. Thompson,* 930 F.2d 1209 (7th Cir.1991) (applying the *Elrod–Branti* test to employees' claims that they were terminated for openly campaigning for incumbents, i.e., displaying campaign bumper stickers, speaking to reporters, putting up signs, attending fundraisers, etc.); *Wilbur v. Mahan,* 3 F.3d 214, 219 (7th Cir.1993) ("It would be a strange rule that gave more job protection to policymaking employees who vociferously attack their superiors than to policymaking employees who do their best to serve those superiors faithfully but have the misfortune to belong to the wrong party.").

On the other hand, some federal decisions decided since *O'Leary* appear to adopt a narrow reading as to when the *Elrod–Branti* test is applicable. *See, e.g., Caruso v. De Luca,* 81 F.3d 666, 669 (7th Cir.1996) (in case where a deputy city clerk ran unsuccessfully against her boss and, post election, was discharged from her job, the court applied the *Pickering– Mt. Healthy* test); *Rogers v. Miller,* 57 F.3d 986, 991 (11th Cir.1995) (in case where adverse job action was taken against sheriff's office employees because of their support of sheriff's opponent in an election, the *Pickering–Mt. Healthy* rule was followed).

In *Pope v. State,* 284 Md. 309, 320 n. 10, 396 A.2d 1054 (1979), the Court of Appeals said:

> We note that, unlike decisions of the Supreme Court of the United States, decisions of federal circuit courts of appeals construing the *federal constitution and acts of the Congress* pursuant thereto, are not binding upon us. Declaration of Rights, Md. Const., Art. 2; *Gayety Books v. City of Baltimore,* 279 Md. 206, 213, 369 A.2d 581 (1977); *Wiggins v. State,* 275 Md. 689, 698–716, 344 A.3d 80 (1975). We are not persuaded to depart from our view of the evidence by the majority opinion of the federal appellate court.

(Emphasis added.)

When the Court of Appeals decides an issue, inferior courts—like this one—are bound to follow that decision. *See Hans v. Franklin Square Hosp.,* 29 Md.App. 329, 335, 347 A.2d 905 (1975), *overruled on other grounds by Brown v. Meda,* 74 Md.App. 331, 537 A.2d 635 (1988) (regardless as to the persuasiveness of a party's interpretation of the law, "it is beyond our authority to decide contrary to clearly established law set forth by the [Maryland] Court of Appeals"). Thus, the motions judge erred when it held that it was not bound to follow the *O'Leary* decision simply because the rule as to when the *Elrod–Branti* test should be utilized has been expanded by decisions by intermediate federal appeals courts. Put bluntly, no matter how intermediate appellate courts "around the country" may have interpreted federal law, the trial court had

no choice but to follow the Maryland Court of Appeals decision in *O'Leary,* because no Supreme Court decision provided an interpretation at odds with the *O'Leary* decision.

■ If the *O'Leary* decision had been followed, the balancing test set forth in the *Pickering–Mt. Healthy* line of cases, rather than *Elrod–Branti* test, should have been applied because Mr. Newell did not show, as a threshold matter, that political patronage was the sole motive for appellants' discharge. In this case, as in *O'Leary,* a government worker was discharged not due to political patronage but because of overt expressive conduct in supporting a person other than the one who won the election.

■ The Court using the *Pickering–Mt. Healthy* test must first determine whether the government worker's open support of a political candidates constituted comment in regard to a matter of public concern. In this case, it clearly did. *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.,* 149 F.3d 971, 977–78 (9th Cir.1998) (a public employee addresses a matter of public concern when his speech relates to an issue of "political, social, or other concern to the community"); *Vojvodich v. Lopez,* 48 F.3d 879, 885 (5th Cir.1995) (involvement in a political candidate's campaign relates to a matter of public concern). Furthermore, a speaker's discussion of the qualifications of political candidates is at the very core of the First Amendment and deserves the broadest protection. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 687, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). *See also O'Leary, supra,* 313 Md. at 206, 545 A.2d 17.

The second step in the analysis is to determine whether the appellants' interest in speaking upon a matter of public concern outweighed the government's interest in providing effective and efficient services to the public. *See Pickering, supra,* 391 U.S. at 568, 88 S.Ct. 1731, and *Rankin v. McPherson,* 483 U.S. at 387, 107 S.Ct. 2891. In regard to this second step, the motions judge correctly pointed out that outside of wearing Greenleaf pins, all political advocacy by the appellants was done outside the workplace. Thus, the political activity, at the

time appellants engaged in it, plainly did not undermine the government's interest in providing effective and efficient services to the public and was therefore constitutionally protected expression.

Mr. Newell never challenged appellants' competence to perform their jobs. In addition, there is a material issue of fact as to whether their positions were politically sensitive ones. The facts, taken in the light most favorable to appellants, showed that both appellants were low-level, non-policymaking, workers. A jury issue was presented as to whether they could have performed their work just as easily for Mr. Newell as they did for Mr. Greenleaf.

The third step to be applied was whether the appellants' political activity in support of Mr. Greenleaf was a substantial or motivating factor in Mr. Newell's decision to terminate them. A jury could have inferred legitimately that a substantial or motivating factor in their dismissal was due to their constitutionally protected campaign activity in support of Greenleaf. The motions judge agreed. The facts from which such an inference could be drawn were: (1) during the campaign, Mr. Newell told Chief Nagel on several occasions that Ms. Runnels "must not like her job very much" as shown by the fact that she was openly supporting Mr. Greenleaf; (2) during the campaign, Mr. Newell wondered aloud to Chief Nagel why Ms. Runnels "would put herself in [such a] position because it would be bad if Greenleaf lost"; (3) while employed at the State's Attorney's Office both appellants had good records of efficiently and professionally performing their job duties; (4) Mr. Newell rejected Cawley's advice that, prior to firing them, he should evaluate appellants' work performance; (5) on the date they were fired, both the appellants were told that their termination had nothing to do with their job performance; (6) on the date she was terminated, Mr. Newell told Ms. Runnels that she should have known the day after the election that she would not be keeping her job; and (7) the only employees discharged by Mr. Newell prior to the date of his investiture were the three employees in the office who had

overtly supported Mr. Greenleaf. Accordingly, we hold: (1) the trial judge erred in not applying the *Pickering–Mt. Healthy* test in determining whether appellants' campaign activities were constitutionally protected; and (2) if the appropriate test had been applied, the motion for summary judgment as to Mr. Newell should have been denied as to Count I.

■■ The State of Maryland was not liable under Count I because a state is not a "person" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Mr. Newell argued that "the outcome of the constitutional analysis in this case does not depend on a choice between different formulations of the balancing test," i.e., the balancing test set forth in the *Elrod–Branti* line of cases as compared to those in the *Pickering–Mt. Healthy* line. In other words, he argues that even if the *Pickering–Mt. Healthy* analysis should have been applied, summary judgment should have been granted in his favor. That argument overlooks the fact that the motions judge explicitly rejected that argument when he ruled that, if he applied the *Pickering–Mt. Healthy* test, he would have denied Mr. Newell's motion.

In *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001) (quoting *PaineWebber v. East,* 363 Md. 408, 422, 768 A.2d 1029 (2001)), the Court of Appeals said: "[I]t is an established rule of Maryland procedure that '[i]n appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the [trial] court relied in granting summary judgment.'" In any event, for reasons already stated, the appropriate test to be applied was the *Pickering–Mt. Healthy* test, and under that test, summary judgment should have been denied.

Mr. Newell also argues that he was entitled to federal qualified immunity with regard to the 42 U.S.C. section 1983 claim. The basis of that argument is the assertion that his conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known" (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102

S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The motions judge observed that it was unnecessary to rule upon Newell's federal immunity argument because no constitutionally protected rights were violated by Newell. Nevertheless, the court noted that if it were necessary to resolve that issue, it would have ruled that the law was "not clear whether plaintiffs had a protective right to retain their jobs in spite of their speech." The motions judge explained:

In support, this court will note that under the *Elrod–Branti* test plaintiffs would likely not have an absolute right to retain their jobs irrespective of their political support of the incumbent. Further, if the *Pickering–Mt. Healthy* test were the appropriate test in Maryland, Newell could not predict whether state or federal precedent would govern any pending lawsuits. Further, under the *Pickering–Mt. Healthy* test Newell could have reasonably concluded that his actions would be protected. The law cannot require an individual to guess as to what the applicable law may be. For that reason, this court finds that Newell is entitled to federal qualified immunity on Count I.

Because this issue is likely to resurface upon remand, we shall address the aforementioned observation by the motions judge.

At the summary judgment stage, a defendant asserting qualified immunity bears the burden of showing that his conduct was not in conflict with the law, even if the facts are as the plaintiffs claim. *Buonocore v. Harris*, 65 F.3d 347, 357 (4th Cir.1995). That rule, as applied to this case, means that Mr. Newell was obligated to show that his termination of appellants did not violate settled law even if his decision to terminate the two was motivated by appellants' campaign activities.

To determine whether qualified immunity shields a public official, a three-step inquiry is required. One, the right allegedly violated must be identified. Two, it must be decided whether that right was clearly established at the time of the alleged violation, and if so, three, whether a reasonable person

in the official's position would have known that his action violated that right. *Knussman v. Maryland,* 16 F.Supp.2d 601, 610 (D.Md.1998).

The right identified by appellants that Mr. Newell violated was the right to wear Greenleaf campaign buttons, to display Greenleaf yard signs at their residences, to write letters to the local newspapers supporting Greenleaf's candidacy, and to campaign for Greenleaf. This activity was a core freedom protected by the First Amendment.

In regard to the second step, a right is "clearly established" if, at the time of the alleged violation, the right was " 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). This means "that in light of the pre-existing law, the unlawfulness of the official's conduct was reasonably and objectively apparent." *McGreevy v. Stroup,* 413 F.3d 359, 366 (3d Cir.2005) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Taking the evidence in the light most favorable to appellants, appellants showed that the answer to that question is "yes," inasmuch as Maryland courts have repeatedly held that the First Amendment protects government employees' rights to engage in political speech and to support the political candidate of their choice without risk of retaliation on the job. Moreover, the Court of Appeals in *O'Leary* clearly established that political campaigning by a public employee, of the type engaged in by appellants, was constitutionally protected from adverse job actions such as that taken by Mr. Newell. See also *DeBleecker v. Montgomery County, Maryland,* 292 Md. 498, 438 A.2d 1348 (1982); *DiGrazia v. County Executive for Montgomery County,* 288 Md. 437, 447–48, 418 A.2d 1191 (1980).

In regard to the third step, a jury question was also presented as to whether a reasonable person in the position of Mr. Newell would have known that his actions violated the

constitutional rights of appellants. As the appellants point out, the "qualified immunity defenses raised by defendants like Newell in cases like this routinely fail at the summary judgment stage." (citing *Kinney v. Weaver,* 367 F.3d 337 (5th Cir.2004) (en banc); *Williams v. Commonwealth,* 24 F.3d 1526 (6th Cir.1994); *Bass v. Richards,* 308 F.3d 1081 (10th Cir. 2002); *Coady v. Steil,* 187 F.3d 727 (7th Cir.1999); *Stough v. Gallagher,* 967 F.2d 1523 (11th Cir.1992)).

Mr. Newell argues:

A government official is not required to be able to accurately predict the outcome of a future court decision in order to be entitled to qualified immunity. *See Akers v. Caperton,* 998 F.2d 220, 227 (4th Cir.1993). State's Attorney Newell is, thus, entitled to qualified summary judgment even if this court ultimately determines that the plaintiffs' campaign activities were not a legitimate basis under the First Amendment for his decision not to retain them upon taking office as the newly elected State's Attorney.

This is essentially the same argument adopted by the motions judge who was of the view that Mr. Newell had no way of knowing "whether state or federal precedent would govern any pending lawsuits." In light of the *O'Leary* decision, Mr. Newell, a lawyer and a resident of Maryland, knew, or should have known, that if he were sued in State court Maryland precedent would govern and that his actions, like those in *O'Leary,* were illegal. *See also Stough, supra,* 967 F.2d at 1529, which is apposite.

### III. *COUNT II*

Article 40 of the Maryland Declaration of Rights is captioned "Freedom of Press and Speech." It reads: "That the liberty of the press ought to be inviolably preserved; that every citizen of the state ought to be allowed to speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that privilege." The motions judge read Article 40 of the Maryland Declaration of Rights as granting the same rights as those provided in the First Amendment to

the United States Constitution. In this regard, he was correct. *See Jakanna Woodworks, Inc. v. Montgomery County,* 344 Md. 584, 595, 689 A.2d 65 (1997) (it is well established that freedoms protected by Article 40 of the Maryland Declaration of Rights are co-extensive with those protected by the First Amendment).

Because the motions judge found that there had been no violation of the First Amendment, it was not, technically, necessary to rule upon Mr. Newell's alternative argument that, as to Count II, he was entitled to immunity under the Maryland Tort Claims Act (MTCA).

The MTCA allows a plaintiff to sue the State for intentional and constitutional torts, having expressly waived its sovereign immunity where a state official acting in his/her official capacity in the performance of his/her duties, performed such duties without gross negligence or malice. *See* Md.Code Ann., (2004 Repl.Vol.) State Gov't § 12–104. That waiver of immunity by the states comes at a cost to potential plaintiffs, viz.: State personnel are immune from liability if the challenged act or omission falls "within the scope of the public duties of the State personnel *and* is made without malice or gross negligence." *See* Md.Code Ann., (2006 Repl.Vol.) Cts. & Jud. Proc. § 5–522 and State Gov't § 12–105.

Because, upon remand, this immunity issue is likely to be brought up again, it bears analysis. The motions judge said in dicta that if it had been necessary to do so he

would find that there exists no fact that would tend to show that Newell acted with malice or gross negligence. This court recognizes that the question of whether malice or gross negligence existed is a mixed question of law and fact. Plaintiff[s], however, ha[ve] the duty to illustrate for the court that facts would support a finding of malice or gross negligence. As outlined above, *the only evidence that Newell's motivation was improper are a sarcastic smile, the affidavit from the chief of police, and the firing of the three political supporters of Greenleaf at the same time.* This court's [sic] finds that such evidence cannot amount to the

level of malice or gross negligence as characterized under Maryland common law. *See Lee v. Cline,* 384 Md. 245, 863 A.2d 297 (2004). For that reason, this court would grant State Defendants' Motion for Summary Judgment in Count II as pertaining to Newell. This count would remain against [the] State.

(Emphasis added.)

 Under Maryland law, actual malice may be shown to defeat summary judgment under the MTCA. The term "actual malice" means "conduct 'characterized by evil or wrongful motive, intent to injure, knowing *and deliberate wrongdoing,* ill will or fraud....' " *Shoemaker v. Smith,* 353 Md. 143, 163, 725 A.2d 549 (1999) (emphasis added) (quoting *Montgomery Ward v. Wilson,* 339 Md. 701, 728–29 n. 5, 664 A.2d 916 (1995)). *See also Cline,* 384 Md. at 268, 863 A.2d 297. In determining whether the motions judge erred in deciding that Newell was entitled to immunity under the MTCA, we begin with the principle that in deciding whether summary judgment should be granted it is generally inappropriate to grant summary judgment in cases involving motive or intent. *DiGrazia,* 288 Md. at 445, 418 A.2d 1191.

The case of *Lee v. Cline, supra,* which was cited by the motions judge, is the most recent Court of Appeals case discussing what must be shown to establish actual malice. In that case, Keith Lee, an African–American, was driving his automobile when he stopped at a carwash. 384 Md. at 249, 863 A.2d 297. He later noticed that his front license plate was missing. *Id.* He went back to the carwash and found that the plate had been mangled so he put it on the rear floor of his car. Later that afternoon, Mr. Lee saw a police officer following him. *Id.* He pulled to the side of the road, and Deputy Sheriff Gary Cline approached Lee's automobile and asked for Lee's driver's license and registration card. Lee provided the documentation requested and then asked Deputy Cline why he had been stopped. Cline responded that the front license plate was not on Lee's automobile. Lee ex-

plained that the plate had fallen off at a carwash and showed the deputy the mangled front plate. *Id.*

Deputy Cline asked Mr. Lee if he would consent to a search of his car for narcotics and weapons. Lee refused to consent to the search, whereupon Cline said: "I don't need your permission to search the car, I can get dogs in here and search it without your permission." *Id.*

Deputy Cline then took Lee's driver's license and registration card and contacted the Frederick County Emergency Communications Center. About two minutes after the call was placed, the dispatcher called Deputy Cline and told him that the license plate was valid. About a minute later, Deputy Cline called the dispatcher and requested that a canine unit be sent to his location. *Id.* at 250, 863 A.2d 297. The deputy was notified that no canine units were then available; however, about two minutes later, the dispatcher contacted Cline and informed him that a state police canine unit was nearby. Deputy Cline requested that the canine unit respond and notified the dispatcher that he had a suspect who was "not being too cooperative" in that he had refused to consent to a search. *Id.* The deputy asked the dispatcher to send the canine unit and provide Lee's driving record and arrest-warrant status. One minute later, at 3:17 p.m., the dispatcher informed Cline that Lee's driver's license was valid and that he had no points on his driving record, that he was not wanted by any police department, and that he had never been involved in the criminal justice system. At 3:22 p.m., which was over twenty minutes after he was stopped, Mr. Lee got out of his vehicle and stood by the front of it because his legs were getting tired. Deputy Cline yelled at Lee, "Get back in your car," which Mr. Lee did. *Id.* At 3:30 p.m., a canine unit arrived. The dog did a perimeter sniff of Mr. Lee's car, and it was determined that these were no signs of drugs. After the canine unit left, Deputy Cline gave Lee two warning tickets and returned his license and registration. Mr. Lee left the scene of the traffic stop at 3:42 p.m. The Court of Appeals, speaking through Judge Eldridge, ruled that taking the evidence in the light most favorable to Lee, an inference of ill will

on the part of Deputy Cline could be drawn. *Id.* at 270, 863 A.2d 297. Therefore, actual malice may have been present. The Court explained:

Lee argues, and we agree, that a "jury could infer ... that Deputy Cline deliberately prolonged the stop because ... Lee refused to consent to a search of his car." Cline's request to search Lee's automobile when there was no basis for such a search, Cline's retort that he could search the vehicle without Lee's permission, Cline's insistence on obtaining a canine unit, Cline's "yelling" at Lee to get back into the car, the length of the stop, and Cline's reference to Lee as an uncooperative suspect, taken together, could support an inference of ill-will on the part of Cline. A jury issue with regard to malice was generated.

*Id.* (reference to appellant's brief omitted).

There was, in our view, sufficient evidence to show that Mr. Newell's actions in firing the appellants constituted intentional wrongdoing, which constitutes malice.

In this regard, a rational jury could infer that what Mr. Newell told appellants on the date he terminated them was true, i.e., that they were being terminated through "no fault of their own." Based on the contents of Ms. Runnels' affidavit, the jury could also infer that Mr. Newell fabricated his reason for firing appellants to cover up his true motive, i.e., that appellants had been fired for politically supporting Mr. Greenleaf. In sum, the jury could have found that Mr. Newell's actions in terminating appellants were so lacking in cause or justification as to render his stated belief that he had valid ground to terminate them as unreasonable and lacking in credibility. *See Thacker v. City of Hyattsville*, 135 Md.App. 268, 308, 762 A.2d 172 (2000). A finding of lack of credibility could also be inferred from what Mr. Newell told Chief Nagel during the campaign and when he told Ms. Runnels that she should have known she would be fired the day after the election.

For the foregoing reasons, we hold that there was sufficient evidence, if believed, from which the jury could infer that Mr.

Newell acted with actual malice and therefore did not enjoy immunity under the Maryland Tort Claims Act. Thus, the Circuit Court erred in granting summary judgment in favor of the State and Newell as to Count II.

### IV. *ABUSIVE DISCHARGE–COUNT III*

■■■ Appellants, citing *Moniodis v. Cook,* 64 Md.App. 1, 13–14, 494 A.2d 212 (1985), argue that "(a) common law claim of abusive discharge will lie to the extent an employee has been discharged in a way that violates a clear mandate of public policy if there exists a nexus between the defendant's conduct and the decision to fire an at-will employee." This claim was set forth in Count III of appellants' complaint.

To show that appellants' firing violated a clear mandate of public policy, appellants point to section 2–304 of the State Personnel and Pensions Article of the Maryland Annotated Code (1999), and Article 24, section 13–103, of the Maryland Annotated Code (2006). Section 2–304(a)(2)(i) provides that, with exceptions not here applicable, "a state employee . . . may freely participate in any political activity and express any political opinion . . ." Article 24, section 13–103, has a provision identical to section 2–304 of the State Personnel and Pensions Article.

In granting summary judgment as to Count III, the motions judge accepted the arguments of appellees that "nothing in the text or legislative history of the statutes . . . reveal an intent to create a cause of action. . . ." The court also adopted the appellees' argument that Count III would be duplicative of Count II and would be subject to the MTCA and all of its defenses.

We agree that Count III is duplicative of Count II. Application of the *Pickering–Mt. Healthy* test will afford appellants the same rights and grant the appellees the same immunities as those applicable to Count II. In their brief, appellants set forth no meaningful argument to the contrary.[2] Therefore, we

---

2. In their brief, appellants cover this issue with one sentence, viz.: "These rights [i.e., the rights set forth in Article 24, section 13–303 and

shall affirm the motions judge's grant of summary judgment in favor of all defendants as to Count III on the basis that it is duplicative of Count II.

## V. *LIABILITY OF CAROLINE COUNTY FOR THE WRONGS ALLEGED IN COUNTS I AND II*

Appellants assert that the County is liable under the federal and Maryland Constitution for their illegal termination. First, they allege that when he fired the appellants, Newell was establishing not only State policy but County policy, as well. Second, they contend that the County is responsible for its own participation in their illegal terminations. The circuit court granted the County's motion to dismiss Counts I, II, and III insofar as plaintiffs alleged in those counts that the County was responsible for Newell's actions when he fired them. Subsequently, the court granted summary judgment in favor of the County as to those counts insofar as the appellants espoused the alternative theory that the County's agents participated in the decision to fire them.

### A. *The First Ground*

In *McMillian v. Monroe County, Alabama,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), the Supreme Court said:

> We held in *Monell [v. New York City Dep't of Soc. Servs.],* 436 U.S. [658,] 694, 98 S.Ct. [2018,] 2037–2038, 56 L.Ed.2d 611 [ (1978) ], that a local government is liable under § 1983 for its policies that cause constitutional torts. These policies may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Ibid.* A court's task is to "identify those officials or governmental bodies who speak with

section 2–304 of the State Personnel and Pensions Article] are broader than the corresponding constitutional rights of public employees to participate in political campaigning, as they make no exception for policymaking or confidential employees." Appellants cite no authority for this argument. In our view, the statutes, assuming that they contemplate a civil suit, have no greater breadth than a cause of action filed pursuant to Article 40.

final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989).

*Id.* at 784–85, 117 S.Ct. 1734.

■ To succeed in regards to the first ground, appellants were required to show that Newell had final policymaking authority concerning the decision to fire them, and that Newell was a policymaker for Caroline County. *Id.* at 785, 117 S.Ct. 1734.

The motions judge granted the County's motion to dismiss the portion of appellants' complaint that attempted to hold the County liable under the theory that Newell was acting as a final policymaker for Caroline County when he fired appellants. In granting the dismissal motion, the court ruled that this inquiry is solely dependent on an analysis of state law. *Id.* at 786, 117 S.Ct. 1734.

The State's Attorney's Office (SAO) is a state constitutionally created office. Md.Const. Art. V, §§ 7–12. The State's Attorney is elected by the citizens of Caroline County, see Article V, section 7, of the Maryland Constitution (2005 Repl. Vol.), but the County government is required by law to pay the State's Attorney's salary and fund the SAO. *See* Md.Code Ann. Art. 10, § 40(a) and Art. 24, § 8–101(2). As part of its funding function, the County performs certain payroll and administrative functions for the State's Attorney and his staff and provides office space and equipment, including telephones, and computers to the office. The County also calculates the payroll based on time sheets submitted by the employees. It also pays the salary of SAO staff; provides SAO personnel with health and disability insurance, personal, vacation, sick, and holiday time, and cost of living adjustments; and allows employees of the SAO to participate in a County pension plan.

To facilitate its funding function, the County sets a budget for the State's Attorney each year. The State's Attorney makes a request to the County Commissioners, the Commis-

sioners consider that request, and the Commissioners either approve the proposed SAO budget or adjust it downward and then adopt the SAO's budget by resolution. The operating budget contains a line item for the salaries of all personnel within the SAO and a separate line item for overtime.

If the State's Attorney wants to take action within the SAO that affects the budget, like hiring an additional employee, generally he or she is required to seek the approval of the County to do so. Otherwise, the County does not participate in the substantive operation of the SAO or in non-budget-related personnel issues. Moreover, the County does not determine when there is a need to fill a position within the SAO. Although job applications come through the County administrative office, the County does not review applications or make any decisions regarding selection but rather passes all of the applications on to the SAO. The County does not determine whom to hire, nor does it train employees to do their jobs. It conducts no performance evaluations of SAO staff. Additionally, the County is not involved in setting employees' work schedules or accommodating their requests for leave (unless it affects payroll). It has no control over promotions or raises, again unless the budget is affected.

In 2000, the County established new rules and regulations concerning County employees. The new rules and regulations defined "employee" as

a person hired to serve the Employer.... Employees in the Sheriff's Department, *Office of the State's Attorney, Office of* the Treasurer and the Circuit Court shall *not be employees as defined in this subsection.*

(Emphasis added.)

These new rules and regulations made it clear that the persons employed at the SAO were not considered County "merit" employees. The new rules and regulations were in effect on the date appellants were fired.

The County and appellants agree that Newell had final policymaking authority concerning the decision to fire SAO employees. The parties differ as to whether Newell was

acting as the final policymaker *for Caroline County* when he fired appellants.

In deciding whether Mr. Newell was a policymaker for the County, we are required to focus exclusively upon the definitions of the State's Attorney's function under Maryland law. *See McMillian, supra,* 520 U.S. at 781, 117 S.Ct. 1734. *See also Bibbs v. Newman,* 997 F.Supp. 1174, 1178 (S.D.Ind.1998) ("The court's 'understanding of the actual function of a government official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.'") (quoting *McMillian,* 520 U.S. at 781, 117 S.Ct. 1734). Contrary to appellants' contention, we do not look to facts established in discovery like those that, at least arguably, would support a finding that in the interim between Mr. Greenleaf's defeat and the investiture of Newell, agents of the County discussed the firing with Mr. Newell and that County agents re-routed telephone calls directed to Ms. Runnels and removed computers in the Caroline County State's Attorney's office.

The most pertinent document to be reviewed to resolve appellants' first argument is the Maryland Constitution, which created Newell's elected position as an "Attorney for the State." Md.Code Ann., Const. Art. V, § 7 (2005, Repl.Vol.). Moreover, the State Government article defines a State's Attorney as a "state official." *See* Md.Code Ann. (2004 Repl. Vol.) State Gov't § 15–102(ii).

The Maryland legislature sets the pay for each State's Attorney (Md.Code Ann., Const. Art. V, § 9) and prescribes the duties of the State's Attorney. Md.Code Ann., Art. 10, § 40(g). Moreover, a State's Attorney is afforded the "broadest official discretion" as a State officer to carry out the functions of the office on behalf of the State. *Murphy v. Yates,* 276 Md. 475, 489, 348 A.2d 837 (1975). No Maryland statute describes a State's Attorney as a county official or delegates to the State's Attorney any administrative power on behalf of a county.

Because appellants failed to point to any constitutional provision or statute supporting their theory that Mr. Newell was acting as the final policymaker for the County when he fired appellants, the circuit court did not err in dismissing the first three counts against the County insofar as those counts alleged that Mr. Newell was acting as an agent for the County when he wrongfully fired the appellants.

## B. *The Second Ground*

 Liability under 42 U.S.C. § 1983 may be predicted upon a defendant's personal involvement in a deprivation of a constitutional right. Evidence that a defendant participated in a conspiracy to deprive a claimant of his or her Constitutional rights is sufficient to impose liability. *See, e.g., Christian v. Cecil Co.*, 817 F.Supp. 1279, 1287 (D.Md.1993). Additionally, liability can be established by showing that a defendant had actual knowledge of the improper conduct and acquiesced in it. *Coleman v. Kaye*, 87 F.3d 1491, 1508 (3d Cir.1996).

The circuit court granted summary judgment in favor of the County insofar as appellants alleged in the first three counts that agents of the County participated in the wrongful decision to terminate the appellants.

The appellants contend that the County participated in the decision to fire them because agents of the County: (1) acquiesced in the firings; (2) ratified the firings; or (3) conspired to retaliate against appellants for the exercise of their constitutional rights. These contentions are without merit.

### 1. Acquiescence

 To prove acquiescence, appellants point to Newell's deposition testimony showing that he and Cawley (the County Administrator) met in early December 2002 to discuss the firings. During the meeting, Cawley told Newell that appellants and Ms. McBride were at-will employees and (according to Newell's testimony) Cawley made no real effort to dissuade him (Newell) from terminating appellants.

It may be true, as appellants' allege, that Cawley, on behalf of the County, voiced no objection to the termination of appellants employment. But there were no facts produced in discovery from which a jury could infer that Cawley knew that Mr. Newell was firing appellants because they had overtly supported Mr. Greenleaf in his campaign for election. *See Coleman v. Kaye, supra,* 87 F.3d at 1508 (one must have actual knowledge of illegal conduct in order to acquiesce in it).

## 2. Ratification

In order for the appellants to prove that the County ratified Mr. Newell's conduct, appellants were required to show the "ratification" was of the "misconduct" engaged in by the decision-maker (i.e., Newell). *Hammond v. County of Madera,* 859 F.2d 797, 802 (9th Cir.1988). One of the acts relied upon by appellants to show ratification was that, at the direction of Cawley, the County took an "unusual interest in the campaign activities" of the appellants. Cawley testified at deposition that, during the period between the primary and general election, he received a complaint from Jack Cole, the President of the Caroline County Commissioners. Cole told Cawley that a "lady had complained" to him about persons in the SAO "making campaign phone calls from the" State's Attorney's Office. Cawley asked the County's emergency management director to investigate. He did so, and the investigations revealed that the total number of calls from the SAO had substantially increased during the period between the primary and general election. Cawley could not recall if he received information about phone calls by each employee or for the State's Attorney's Office in general. In any event, after receiving this information, he elected to take no action.

We disagree with appellants' characterization of Cawley's interest in the phone calls as "unusual." The undisputed evidence was that the investigation was initiated before the general election and was directed not at appellants but at the SAO as an entity. The investigation was legitimate because the County paid for phone usage in the SAO. Quite obviously, the phones should not be used for partisans' political purposes.

The fact that such an investigation was conducted in no way supports the inference that the County "ratified" Newell's act of firing appellants for exercising their First Amendment rights.

 Appellants also point to the fact that during the campaign, when Ms. Cooper told Patricia Eigenbrode, the Personnel Benefits Coordinator for the County, that she was going to take time off to place Greenleaf campaign signs, Eigenbrode told Cawley. Later, agents of the County reviewed Cooper's time cards to see how Ms. Cooper had reported that time off. As far as is shown in the record, the review revealed nothing improper on Ms. Cooper's part. Proof that the County agent's checked the time records of Ms. Cooper while the campaign was taking place plainly did not support an inference that Cawley, or any other County agent, ratified Newell's decision to fire appellants because the latter had exercised their Constitutional rights to support Greenleaf as a candidate.

 What we have already said is equally true in regard to Cawley's actions in temporarily removing Ms. Runnels' phone and computer. The undisputed evidence was that these actions were taken because it had come to Cawley's attention that Ms. Runnels had left an inappropriate message on her voice mail. No evidence was produced from which a juror could infer that this action was taken in retaliation against Ms. Runnels because she had supported Mr. Greenleaf in his election campaign.

For all the above reasons, we hold that the circuit court did not err when it ruled that the County did not "ratify" Mr. Newell's decision to terminate appellants for a constitutionally prohibited reason.

### 3. Conspiracy

 In order to prove a conspiracy under 42 U.S.C. § 1983, a plaintiff must show that the defendants "reached an understanding to deny the plaintiffs their rights . . . and that at least one actionable wrong took place in support of the

conspiracy." *Christian*, 817 F.Supp. at 1287. There was no evidence presented that Cawley or any other agent of the County knew, prior to the time appellants were fired, that Mr. Newell was firing them because they had supported Greenleaf in his campaign. Absent proof of such knowledge, a conspiracy was not shown.

To support their argument that a conspiracy was shown, appellants point to the fact that more than two and one-half years after they were terminated, they asked the County for a hearing concerning their dismissal based on the fact that they were (purportedly) merit employees of the County. The request was denied. Without any explanation, and with no citation of authority, appellants say in their brief that the denial of a hearing, standing alone, was sufficient to establish a violation of 42 U.S.C. § 1983.

We reject this last argument. For starters, the appellants were not merit employees. And, in any event, the mere denial of a hearing does not in any way show that Newell and the County reached an understanding more than two years earlier that appellants should be fired for their engagement in overt political activities.

For the above reasons we hold that the motions court did not err in granting the County's motion to dismiss portions of the first three counts and in later granting summary judgment as to the remaining portion of those counts.

## VI. *LIABILITIES OF CAROLINE COUNTY FOR APPELLANTS' OVERTIME PAY CLAIM*

In their complaint, appellants allege that the County violated the Fair Labor Standards Act (29 U.S.C. § 207(A)(2)(C)) and the Maryland Wage and Hour Law (Md.Code Ann., (1999 Repl.Vol.), Lab. & Empl. Article, Section 3–415(a)) by refusing to pay them overtime wages for time worked in excess of forty hours per week. They also allege that the County forced them to take compensatory time off for their overtime work at

a straight "time for time" rate rather than be paid overtime wages at a time and a half rate.[3]

According to the County, it was not the employer of either of the appellants for purposes of liability under the above statutes. Further, the County argues that it did not have actual or constructive knowledge of appellants' overtime hours and thus did not "suffer or permit" appellants to work overtime hours. The grant of summary judgment in favor of the County was based on both these grounds.

## A. *The Economic Reality Test*

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency...." 29 U.S.C. § 203. Under this definition, two employers may be jointly liable for a violation of the FLSA. 29 C.F.R. § 791.2.[4] *See Bonnette v. California Health & Welfare Agency*, 525 F.Supp. 128, 134 (N.D.Cal.1981) ("[t]he definition of 'employer' has been codified to recognize the joint employment situation and by its terms includes employ by public agencies."). "These definitions are very broadly cast, and courts have accordingly found an employment relationship for purposes of the Act far more readily than would be dictated by common law doctrines." *Shultz v. Falk*, 439 F.2d 340, 344 (4th Cir.1971) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)). To "employ" a person under these statutes means to "suffer or permit them to

---

3. Count IV of the Amended Complaint alleges that the County violated provisions of the Fair Labor Standards Act, and Count VI alleges violations of corresponding provisions of Maryland's wage and hour laws. Under those provisions, employers cannot require covered employees to work more than forty hours per week, unless those employees receive at least one and one-half times their regular rate of pay. 29 U.S.C. § 207; Md.Code Ann., Lab. & Empl., § 3–415 (1999). The County, while not disputing that overtime violations may have occurred, contends that it cannot be held liable for those alleged violations.

4. The State, because it has not waived its immunity under the Eleventh Amendment, was not sued for violation of the FLSA.

work." 29 U.S.C. § 203(g); *see also* Md.Code Ann.(1999 Repl.Vol.), Lab. & Empl. Article, § 3–101(c) ("employ" means to "engage an individual to work," which includes "allowing an individual to work").

It is the plaintiff's burden to prove that he or she was "employed" by the defendant. *Davis v. Food Lion,* 792 F.2d 1274, 1277 (4th Cir.1986). Whether one is "employed" within the meaning of the FLSA is determined by examining the "economic reality" of the employment situation. In other words, an entity's control over relevant aspects of a plaintiff's employment is used to determine whether an entity is an employer under the FLSA. *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 966 (6th Cir.1991); *Dole v. Simpson,* 784 F.Supp. 538, 545 (S.D.Ind.1991); *see also Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973) (company's "managerial responsibilities" that gave the defendant partners "substantial control of the terms and conditions of the work" of the employees showed that partners were "employers" for purposes of the FLSA). Factors relevant to the "economic reality" analysis include: (1) the power to hire and fire the employee; (2) supervision and control of the employee's work schedule or conditions of employment; (3) determining the rate and method of payment for the hours worked; and (4) maintenance of employment records. *See Brickey v. County of Smyth,* 944 F.Supp. 1310, 1315 (W.D.Va. 1996). The central inquiry under the FLSA is whether the defendant had sufficient control over those aspects of the employment relationship that gave rise to the alleged violation. *Dole v. Simpson, supra,* 784 F.Supp. at 545 (citing *Donovan v. Grim Hotel Co.,* 747 F.2d 966, 972 (5th Cir.1984)). The defendant's control over the relevant aspects of employment need not be exclusive. *See Elliott Travel & Tours,* 942 F.2d at 966; *Braddock v. Madison County,* 34 F.Supp.2d 1098, 1107 (S.D.Ind.1998).

The County and appellants agree that the economic reality test outlined in *Braddock v. Madison County, supra,* is the appropriate one to be used in determining whether an

entity is an "employer" under the FLSA and under Maryland's Wage and Hour Law. No one factor is dispositive; the factors are only a "means to determine if the alleged employer has enough control over the employee, his working conditions, his workplace, and his pay to compel compliance with the Act." *Brickey*, 944 F.Supp. at 1315. A court is not to look at these factors "mechanically"; instead, it must examine the totality of the circumstances when applying the four factors.

## B. *Hiring and Firing*

Save for the exception mentioned in the next sentence, the State's Attorney decides whom to hire. Nevertheless, if the State's Attorney were to hire someone who is objectionable to the County Council, the Council has the power to withhold funding for the position. As mentioned *supra*, the State's Attorney—not the County—has final authority over whom to fire.

## C. *Work Schedule or Conditions of Employment*

The County establishes the hours of operation of the SAO. But the State's Attorney establishes the work schedule of the various employees and provides day-to-day supervision of the employees. The State's Attorney, not the County, trains employees to do their substantive work, conducts performance evaluations, and establishes the reporting hierarchy within the SAO. No County agent is consulted with regard to an employee's request to work overtime; that request is directed to and decided by the State's Attorney.

## D. *Maintenance of Records*

Except for overtime records, the County maintains the employment records for the SAO. The SAO had a separate system for recording overtime. Prior to the subject suit being filed, if an employee were authorized by the State's Attorney to be paid overtime for extra hours worked, the employee was directed to put those hours on his or her time sheet, which was then submitted to the County for payment. Those hours were paid at a rate of time-and-one-half. If there was insuffi-

cient overtime in the budget to pay the employee (a matter that was determined by the State's Attorney), the employee was to record the time on a separate "comp time" sheet, which would allow that employee to take compensatory time off. The comp timesheets were maintained in the SAO and not by the County. Employees were to keep a log of their hours worked each day, identifying any amount of hours over eight in one day in a separate column as "comp" time. Employees submitted these records to their SAO supervisor, Betsy Le-Compte, who reviewed the records and also was responsible for approving employee's requests to use their accrued comp time. Employees were instructed not to record comp time on the time cards that they submitted to the County; rather, they were only to record the comp time on the comp time log, which was not submitted to the County.

### E. *Determination of Rate of Pay and Method of Payment*

The parties are at odds as to whether the County knew of the SAO's practice of awarding comp time, rather than wages of time-and-one-half for hours in excess of forty hours per week. But, taking the evidence in the light most favorable to the appellants, the evidence showed that the County did have such knowledge.

In 1991, while Mr. Jensen was the State's Attorney, Ms. Cooper wrote the County and advised that while on maternity leave "the first eight days of my leave will be compensatory time." Therefore, this letter proved that the County received written notice that a "comp time system" of some sort was being used.

Mr. Jensen testified that during the years he was State's Attorney he presented fourteen proposed budgets to the County Council. The amount he requested for overtime was always reduced by the Council. During budget discussions with the Council, he (Mr. Jensen) always took the position that he would rather pay time-and-one-half, rather than "comp" time. He was told by the County to pay "comp" time in lieu

of overtime. His deposition testimony in this regard is instructive:

> Counsel for State: Was the County aware that in order to fulfill your duties as State's Attorney that you would have to have your employees work overtime but not be paid out of an overtime budget?
>
> Mr. Jensen: Yes.
>
> Counsel for State: Okay, sir, was the County aware that you were allowing staff in the State's Attorney's Office to use comp time in lieu of overtime payment?
>
> Mr. Jensen: Yes.
>
> Counsel for State: Sir, was the County aware of, as you testified on Wednesday, that the case load of your office had increased from the time you started there until the time you left office?
>
> Mr. Jensen: Yes. They were very aware.
>
> Counsel for State: Was the County aware of the extent of that increase?
>
> Mr. Jensen: Yes.
>
> Counsel for State: How were they aware of that?
>
> Mr. Jensen: I specifically made them aware. And I provided them documentation which was produced by the Administrative Office of [the] Court in the annual report that the Administrative Office of [the] Court produces on the state of the judiciary in Maryland. Part of that is county-by-county breakdown of prosecution.

During Mr. Jensens' tenure, comp time was calculated at one-and-one-half times the hours of overtime actually worked. Thus, if any employee worked four hours of overtime he would receive six hours of comp time.[5]

Mr. Greenleaf testified that County Administrator Cawley was "extremely stingy with (overtime) budgets." As a result,

---

**5.** This practice did not comply with the law, which requires that the employer pay a *wage* of at least one-and-one-half times the usual hourly wage.

Greenleaf felt he had no choice but to direct that employees, like appellants, accept comp time on an hour-for-hour basis.

In 2001, Betsy LeCompte told Greenleaf that she had been instructed by the County that the SAO was not calculating comp time in accord with County policy. A memo dated February 13, 2001, authored by Mr. Greenleaf, said that henceforth, the SAO would pay compensatory time on a time-for-time basis unless approved at time and one half for special assignments.

Ms. Runnels testified at her deposition that in the interim between the date Mr. Newell told her she would be fired and the date Mr. Newell took office, she told Patricia Eigenbrode, a County official, that she had accumulated "a lot of compensation time and asked how she would be paid for it." Ms. Eigenbrode responded that she could not "cash out" her overtime, instead she must "use it or lose it".

## VII. *ANALYSIS*

As mentioned earlier, under the economic reality test, four factors are to be utilized to determine if Caroline County exercised "sufficient control" over those aspects of the employment relationship, that gave rise to the alleged violation. *Braddock*, 34 F.Supp.2d. at 1107. The first economic reality factor favors the County, because, as a general rule, the State's Attorney, not the County, decides whom to hire and fire.

The second factor, in large part, also favors the County because it is the State's Attorney who has control over the employees' work schedule, although the County establishes the hours of operation of the SAO.

The third factor favors the appellants because the County determines the rate and method of payment of workers in the SAO and develops the classification and job description of the employees.

The fourth factor also favors the appellants. The employment records of the appellants are kept by the County and,

taking the evidence in the light most favorable to the appellants, the County knew, from as far back as when Mr. Jensen was State's Attorney, that the SAO had a practice of awarding "comp" time rather than wages equal to time and one-half for hours in excess of forty per week.

Contrary to the ruling of the motions judge, there was enough evidence produced by appellants to show that the County had "sufficient control over those aspects of the employment relationship that gave rise to the alleged violation" to be held responsible. *Braddock, supra,* 34 F.Supp.2d at 1104. The County exercised actual control by its budgetary powers. The evidence produced by appellants showed that the County, by restricting the amount of overtime it would pay, forced the State's Attorney's Office to utilize the overtime scheme at issue. In this regard, the facts in this case are very similar to those in *Braddock, supra.*

In *Braddock,* a bailiff and three court reporters sued Madison County, Indiana, under the FLSA. *Id.* at 1100. The plaintiffs were hired by the Unified Courts of Madison County but were paid by Madison County. *Id.* at 1101. The judges for the Unified Court had the power to hire and fire plaintiffs but had no direct control over their pay. *Id.* Madison County set the employee's rate of pay and controlled the number of employees who could fill the position of court reporters and bailiff by exercising its budgetary control. In other words, the judges were required to request from Madison County permission to hire additional employees, and that request, at the option of the County, could be accepted or rejected. *Id.*

Because of the needs of the court, each of the *Braddock* plaintiffs worked more than forty hours per week without extra cash compensation. *Id.* at 1100. Instead of paying these employees time and one-half wages, the judges worked out an informal system whereby the employees were paid compensation time. In 1995, agents of the Unified Court advised Madison County of the underpayment of the employ-

ees, but the County auditor refused to pay any additional compensation. *Id.* at 1104. The plaintiffs then brought suit.

In *Braddock,* the issue to be decided was whether Madison County was the joint employer of the plaintiffs, within the meaning of the FLSA. *Id.* at 1106–07.

In support of its holding that the plaintiffs were joint employers of Madison County, the District Court stressed that the County, through its budgetary powers, controlled the plaintiff's compensation. *Id.* at 1007. The Court explained:

The overtime violations alleged here depend upon both wage payments and hours of work. It is, after all, the relationship between compensation and work schedule that the FLSA's overtime provision governs. Under Indiana law, the County Council is the fiscal body that appropriates money to pay the plaintiffs for their services. (The Auditor then pays plaintiffs with duly appropriated funds.) The evidence here shows that the County Council has controlled plaintiffs' compensation. The County Council set the annual level of compensation for each position with the Unified Courts. The County Council also had the authority to appropriate additional funds for overtime. It has done so for other agencies it funds, including the Sheriff's Department and the County Highway Department. When the Unified Courts sought additional funds for overtime, however, the County Council rejected the requests.

According to plaintiffs and the judges who supervise them, the root of the problem here is that staffing for the courts simply has not been great enough to keep up with the courts' growing caseloads. For that reason compensatory time has not been a satisfactory solution to deal with plaintiffs' overtime. To the extent that overtime is the result of higher caseloads rather than specific and unusual needs, compensatory time merely reduces an already insufficient staff, so that the staff falls still farther behind.

This court is not in a position to evaluate the actual need for additional staff for these courts. That need is not relevant for purposes of the FLSA, which requires overtime

compensation if the employee is "suffered" or "permitted" to work. In terms of allocating responsibility for the FLSA violations, there is no doubt on this evidence that the County Council also controlled the levels of staffing in the Unified Courts. The County Council decided exactly how many positions it would fund in the Unified Courts and exactly how much the employee in each position would be paid. When workload seemed sufficient to warrant additional hiring, the County Council controlled that decision. For example, the County Council appropriated funds for part-time positions to help Judge Clem deal with additional case-load.

*Id.* at 1107–08.

We believe that *Braddock* was correctly decided and is directly on point. Here, as in *Braddock*, the root of the problem is that the County knew of the SAO's overtime problems but refused to adequately fund overtime. If it had adequately done so, the SAO would not have had to resort to the comp time scheme used, which was similar to the one at issue in *Braddock*. Caroline County's control of the State's Attorney's Office was the most important aspect of the relationship between appellants and the County and the one that gave rise to the violation at issue. In this appeal, the County does not attempt to distinguish *Braddock*.

Also analogous to this case is *Barfield v. Madison County, Mississippi*, 984 F.Supp. 491 (S.D.Miss.1997). In *Barfield*, the court was required to decide whether the defendant, also named Madison County, could be held liable for an FLSA violation as an employer of Sheriff Department employees. The Sheriff directly supervised the plaintiff and had repeatedly asked the county government to budget funds for overtime. The Sheriff's requests were refused and the Sheriff was told by members of the County Board of Supervisors that the County was not to record actual hours worked. *Id.* at 494–95. The Court in Barfield, held that the County government was a joint employer for purposes of the FLSA. *Id.* at 498–99.

Caroline County attempts to distinguish *Barfield* on the grounds that in *Barfield* the County Commissioners refused to fund any overtime for the Sheriff's Office, whereas in this case, the Caroline County government did fund some overtime. This is a distinction without a difference, in light of the testimony of Mr. Jensen and Mr. Greenleaf that the overtime portion of the budget was chronically underfunded and the County was well aware of the underfunding.

As an alternative basis for its decision to grant summary judgment in favor of the County, the motions judge ruled that, even if the County was the joint employer of the appellants, the County was nevertheless not liable because it did not "suffer or permit" appellants to work overtime. That ruling, if correct, was determinative, because to establish liability, as a threshold matter, appellants were required to show that the County had either actual or constructive knowledge of the fact that the appellants had been awarded compensation time rather than overtime wages. *Bailey v. County of Georgetown,* 94 F.3d 152, 157 (4th Cir.1996). *See Pforr v. Food Lion, Inc.,* 851 F.2d 106, 109 (4th Cir.1988) (holding that "this burden is squarely upon the plaintiff; a defendant . . . . is not required to show lack of knowledge as an affirmative defense.").

In *Pforr,* supra, the Court said:

It is not enough for a plaintiff to establish his employer's knowledge of a few incidents of off-the-clock work, and upon this claim of knowledge, submit a record of his three years of alleged off-the-clock work. A necessary part of plaintiffs' burden of proof at trial was to show Food Lion 'suffered' or allowed them to work off-the-clock hours . . . This does not mean proof of each hour claimed, on each date, but *plaintiff must show by actual knowledge or by a pattern and/or practice that the employer "suffered" or allowed the off-the-clock work claimed.*

851 F.2d at 109 (emphasis added).

In the case at hand, it is true that the County did not have knowledge as to each and every hour of overtime for which the

appellants were under-compensated. But, taking the evidence in the light most favorable to the appellants, the County had sufficient notice concerning the SAO's overtime practices to impose liability. Mr. Jensen and Mr. Greenleaf told the County that the SAO was inadequately staffed and that it required substantial additional overtime funding in order for the SAO to keep up with its rapidly expanding case load. The County, nevertheless, failed to approve the overtime funds requested. That refusal, standing alone, was sufficient to prove constructive knowledge. *Barfield, supra,* 984 F.Supp. at 498–99. Moreover, there was direct evidence from which a jury could find that agents of the County, at all times here pertinent, were aware of SAO overtime practices. Mr. Jensen and Cawley had detailed discussions about SAO operations, including its compensation time practices. In similar discussions between Mr. Jensen and Ms. Eigenbrode, the latter learned that after the SAO exhausted its overtime budget, it awarded compensation time to its staff for overtime that they worked. Ms. Cooper also made that known to Ms. Eigenbrode as did Ms. Runnels who, after she had been notified that she would be fired, discussed the comp-time issue with her on at least two occasions.

For the above reasons we hold that the motions judge erred in granting the County's motion for summary judgment as to Counts IV and VI.

**JUDGMENT IN FAVOR OF JONATHAN NEWELL AS TO COUNTS I AND II REVERSED; JUDGMENT IN FAVOR OF THE STATE OF MARYLAND AS TO COUNT II REVERSED; JUDGMENT IN FAVOR OF CAROLINE COUNTY AS TO COUNTS IV AND VI REVERSED; ALL OTHER JUDGMENTS AFFIRMED. COSTS TO BE DIVIDED AS FOLLOWS: TWENTY–FIVE PERCENT TO BE PAID BY APPELLANTS, TWENTY–FIVE PERCENT TO BE PAID BY CAROLINE COUNTY, FIFTY PERCENT TO BE PAID JOINTLY BY JONATHAN NEWELL AND THE STATE OF MARYLAND.**